The People of the State of New York ex rel. George Tyroler, Appellant, *v.* The Warden of the City Prison of the City of New York, Respondent.

Unconstitutionality of Act Limiting Sale of Passage Tickets. Chapter 506 of the Laws of 1897 (Penal Code, §§ 615, 616), which prohibits, and subjects to punishment as a crime, the selling of tickets for passage on vessels or railroad trains, by any person except common carriers and their specially authorized agents, transcends the police power and violates the constitutional guarantees of civil rights and privileges and of liberty (N. Y. Const. art. 1, §§ 1, 6), in so far as it undertakes to prohibit citizens of the state from engaging in the business of brokerage in passage tickets.

*People ex rel. Tyroler* v. *Warden*, 26 App. Div. 228, reversed.

(Argued June 23, 1898; decided November 22, 1898.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, entered February 28, 1898, affirming an order of the Special Term dismissing the relator's petition for a writ of habeas corpus, and remanding him to the custody of the defendant.

The relator is a citizen of the state of New York and the United States, and immediately prior to his arrest, and for several years before that time, had been engaged in the city of New York in the business of selling, and offering for sale, and procuring tickets, giving, and purporting to give, the right to a passage and conveyance on vessels and railway trains. He is charged with having received the sum of $6.30 as a consideration for a passage or conveyance upon a ferryboat, train and vessel from the city of New York to the city of Norfolk, Virginia, and for the procurement of a ticket giving the absolute right of passage and conveyance upon such ferryboat, train and vessel, he not being at the time an authorized agent of the owners or consignees of such vessel, or of the company running such train. It is not pretended that the relator did not come into the possession of the tickets lawfully and by purchase from the transportation companies issuing them.

The relator sued out a writ of habeas corpus and demanded his discharge from the custody of the defendant on the ground that the act of 1897 (Ch. 506) violated certain provisions of the Constitution of the State of New York and the Constitution of the United States, and was, therefore, void.

The Special Term made its order dismissing the writ and remanded the relator.

The Appellate Division affirmed that order.

*Samuel Untermyer, Louis Marshall* and *Abraham Gruber* for appellant. The statute under which the relator is prosecuted is unconstitutional, because it deprives him of his liberty without due process of law; because it deprives him of rights and privileges secured to a citizen of the state, and because it abridges his privileges and immunities as a citizen of the United States, and denies to him the equal protection of the laws. (State Const. art. 1, §§ 1, 6; Federal Const. 14th amdt.; *U. S.* v. *Trans-Missouri Freight Assn.,* 166 U. S. 290; *Slaughter House Cases,* 16 Wall. 36, 130; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Yick Wo* v. *Hopkins,* 118 U. S. 356; Tiedeman on Limitations of Police Power, 292; *Matter of Jacobs,* 98 N. Y. 98; *People* v. *Marx,* 99 N. Y. 377; *People* v. *Gillson,* 109 N. Y. 389; *People* v. *Sheldon,* 139 N. Y. 263; *Judd* v. *Harrington,* 139 N. Y. 105; *Colon* v. *Lisk,* 153 N. Y. 188; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *City of Baltimore* v. *Radecke,* 49 Md. 217; *Gilman* v. *Tucker,* 128 N. Y. 190; *Forster* v. *Scott,* 136 N. Y. 577.) This legislation is likewise unconstitutional, because it deprives the relator of his property without due process of law. (Penal Code, §§ 536, 546, 616; *People ex rel.* v. *Village of Haverstraw,* 151 N. Y. 75.) The act is likewise unconstitutional, because it amounts to a regulation of commerce among the several states by the legislature of the state of New York. (Black's Const. Laws, pp. 170, 171; *Gloucester Ferry Co.* v. *Pa.,* 114 U. S. 196; *Henderson* v. *Mayor of New York,* 92 U. S. 259; *Hall* v. *De Cuir,* 95 U. S. 485; *McCall* v. *California,* 136 U. S. 104; *Leloup* v. *Port of Mobile,* 127 U. S.

118 People ex rel. Tyroler *v.* Warden of Prison. [Nov.,

Opinion of the Court, per Parker, Ch. J.　　[Vol. 157.

640; *W. U. Tel. Co.* v. *Alabama*, 132 U. S. 472; *Brown* v. *Maryland*, 12. Wheat. 419; *Welton* v. *State of Missouri*, 91 U. S. 275; *Pickard* v. *Pullman S. C. Co.*, 117 U. S. 34; *Robbins* v. *Shelby County Taxing Dist.*, 120 U. S. 489; *Asher* v. *Texas*, 128 U. S. 129; *Stoughtenburgh* v. *Hennick*, 129 U. S. 141; *Brennan* v. *Titusville*, 153 U. S. 287; *Leisy* v. *Hardin*, 135 U. S. 100; *Walling* v. *Michigan*, 116 U. S. 446; *Minnesota* v. *Barber*, 136 U. S. 313; *Brimer* v. *Rebman*, 138 U. S. 78; *Voight* v. *Wright*, 141 U. S. 62; *Brown* v. *Houston*, 114 U. S. 622; *People* v. *Hawkins*, 20 App. Div. 494; *Scott* v. *Donald*, 165 U. S. 58.) This legislation further offends the Constitution of the state of New York, because it is practically an abdication of governmental functions in favor of private individuals and corporations. (*Barto* v. *Himrod*, 8 N. Y. 483.)

*James D. McClelland* and *Charles E. Le Barbier* for respondent. The legislature has power to restrict the sale of passage tickets on vessels and railroads to the authorized agents of the companies running them. (*Rogers* v. *Common Council of Buffalo*, 123 N. Y. 181; *People* v. *Budd*, 117 N. Y. 29; *People* v. *Ewer*, 141 N. Y. 132; *Hill* v. *Thompson*, 16 T. & S. 481; *S. C.*, 18 Iowa, 165; *Live Stock Assn.* v. *Crescent City, etc.*, 1 Abb. [U. S.] 388, 398; *Slaughter House Cases*, 16 Wall. 36, 106; *Matter of Jacobs*, 98 N. Y. 98; *Bertholf* v. *O'Reilly*, 74 N. Y. 509; *People* v. *Marx*, 99 N. Y. 377; L. 1897, ch. 506; Penal Code, §§ 615, 616; *Com.* v. *Wilson*, 14 Phila. 384; *People* v. *Cannon*, 10 N. Y. Cr. Rep. 497; *People* v. *Cannon*, 139 N. Y. 32.) There is nothing in the act which deprived the petitioner of the property in the ticket. (*State of Minnesota* v. *Corbett*, 24 L. R. A. 498.)

Parker, Ch. J. The statute that appellant insists is in derogation of the limitation placed upon the legislative power by the People, through the Constitution of the state, reads as follows: "Section 1. The Penal Code is hereby amended by inserting therein a new section, to be known as section six

1898.] People ex rel. Tyroler *v.* Warden of Prison. 119

N. Y. Rep.]    Opinion of the Court, per Parker, Ch. J.

hundred and fifteen, to read as follows : § 615. *Sale of passage tickets on vessels and railroads forbidden, except by agents specially authorized.* No person shall issue or sell, or offer to sell, any passage ticket, or an instrument giving or purporting to give any right, either absolutely or upon any condition or contingency to a passage or conveyance upon any vessel or railway train, or a berth or stateroom in any vessel, unless he is an authorized agent of the owners or consignees of such vessel, or of the company running such train, except as allowed by sections six hundred and sixteen and six hundred and twenty-two ; and no person is deemed an authorized agent of such owners, consignees or company, within the meaning of the chapter, unless he has received authority in writing therefor, specifying the name of the company, line, vessel or railway for which he is authorized to act as agent, and the city, town or village together with the street and street number, in which his office is kept, for the sale of tickets."

"Section 2. Section six hundred and sixteen of the Penal Code is hereby amended so as to read as follows : § 616. *Sale by authorized agents restricted.* No person, except as allowed in section six hundred and twenty-two, shall ask, take or receive any money or valuable thing as a consideration for any passage or conveyance upon any vessel or railway train, or for the procurement of any ticket or instrument giving or purporting to give a right, either absolutely or upon a condition or contingency, to a passage or conveyance upon a vessel or railway train, or a berth or stateroom on a vessel, unless he is an authorized agent within the provisions of the last section ; nor shall any person, as such agent, sell, or offer to sell, any such ticket, instrument, berth or stateroom, or ask, take or receive any consideration for any such passage, conveyance, berth or stateroom, except at the office designated in his appointment, nor until he has been authorized to act as such agent according to the provisions of the last section, nor for a sum exceeding the price charged at the time of such sale by the company, owners or consignees of the vessel or railway mentioned in the ticket. Nothing in this section or chapter contained shall pre-

vent the properly authorized agent of any transportation company from purchasing from the properly authorized agent of any other transportation company a ticket for a passenger to whom he may sell a ticket to travel over any part of the line for which he is the properly authorized agent, so as to enable such passenger to travel to the place or junction from which his ticket shall read."

The remaining portion of the section relates to the redemption of tickets purchased from an authorized agent of a railway company, under certain contingencies, and within certain periods of time, and is not in anywise involved in this appeal.

Having observed how the statute reads, it will be well next to analyze it and see if we can find out what was intended to be accomplished, and is in fact accomplished, by the phraseology of the statute, in order that we may ascertain whether the statute is in contravention of any of the rights secured by the Constitution to the citizen. It will be observed in the first place that it does not prohibit the sale of tickets absolutely, nor does it limit to the particular transportation company over whose route he desires to be conveyed, the right to sell tickets to the traveler. It may be said in passing, that the last assertion is in conflict with the position taken by the learned judge who wrote the opinion of the Appellate Division; for he assumes that as only persons appointed agents can sell, the effect of the provision is that a corporation "shall only sell through its agents, and is merely a declaration that the corporation itself was to sell its tickets."

The first section and the first part of the second section do restrict the sale of passage tickets to agents specially authorized by transportation companies, and if there was nothing else in the statute upon the subject, it would bear the construction put upon it, that its only effect is to confine the right to sell passage tickets of a corporation to that corporation itself, which can act only through agents; but between the opening and the closing sentences of the second section may be found the following: "Nothing in this section or chapter contained shall prevent the properly authorized agent of any transpor-

tation company from purchasing from the properly author-
ized agent of any other transportation company a ticket for a
passenger to whom he may sell a ticket to travel over any
part of the line for which he is the properly authorized agent,
so as to enable such passenger to travel to the place or junc-
tion from which his ticket shall read." Thus we see that the
moment a man becomes the agent of a transportation com-
pany he is by that designation authorized to buy tickets of any
other transportation company in the United States or the
world, and may sell such tickets to any person who applies for
them. In the sale of tickets of the various transportation
companies, other than those of the company of which he is
an agent, he necessarily acts as a broker. He can buy the
tickets and sell them again, making a profit that may perhaps
depend more or less on the degree of competition between
railroads in various parts of the country. Clearly, the agent
of a transportation company, in the purchase and sale of
tickets of foreign corporations, is not engaged in selling the
passage tickets of the transportation company appointing him.
It is not the sale of the tickets of his principal alone that the
agent is thus engaged in; but when a transportation company
appoints an agent to sell its tickets, then the state, by this
statute, steps in and attempts to clothe him with the power
which it takes from all other citizens to deal in the tickets of
as many other transportation companies as he may be able to
make satisfactory arrangements with.

This leads us to note another interesting feature of this
remarkable statute. The buying and selling of passage tickets
is not abolished; it is only condemned where the seller has
not authority from some one of the transportation companies
to act as its agent. It has happened before that for the pro-
tection of the people the lawmaking power has provided for
an examination for the purpose of ascertaining whether appli-
cants possessed suitable qualifications as to character, intelli-
gence and financial responsibility to fill certain positions of
trust, or to engage in a business which might prove dangerous
to the people in the hands of a person either incompetent or

16

122 People ex rel. Tyroler *v.* Warden of Prison. [Nov.,

Opinion of the Court, per Parker, Ch. J.     [Vol. 157.

of bad character; but in no instance has it conferred a general and unlimited power of appointment upon a class of persons or corporations wholly unconnected with the state government. It may possibly be that there was such a situation as would have justified an enactment placing some restrictions upon those engaged in the selling of passage tickets and prescribing penalties by way of fine or imprisonment for those who should break over such restraints. Our excise legislation affords an illustration. By its provisions all are permitted to sell liquor within certain limitations that apply to all citizens alike, and for the violation of the regulations of the traffic are provided certain penalties that are expected to assure to the public some measure of protection from non-law-abiding citizens engaged in the business. But this act simply turns over to the transportation companies the selection of those who are hereafter to be permitted to sell tickets. It imposes no restraints whatever upon the appointing power, nor upon the agents selected, other than that in the purchase of tickets he must confine himself to the properly authorized agents of the transportation companies. The business of buying and selling tickets, as to such agents, continues to be a legitimate business, but to all citizens other than those who may be selected by the transportation companies, the right to buy and sell tickets is denied and an actual sale by them constitutes a felony. The act itself is silent as to the motive of its enactment by the legislature, and it contains no suggestion as to the public interests which its purpose is to subserve.

Ticket brokerage as a business has been in existence for many years. It is a matter of common knowledge that at great agencies such as Cook's and Gaze's, tickets can be purchased over a great portion of the transportation routes of the world. Intending travelers in great numbers have gone to those agencies for advice as to choice of routes to be taken in contemplated journeys and to purchase the tickets for the trip, whether it should require days, or weeks, or months to make it. The traveling public in large numbers have come to make use of the facilities afforded by such agencies, of

which there are now very many. And Cook's and Gaze's are among the agencies that must go out of business in this state if this statute can live, unless some transportation company shall deem it wise to clothe them with the authority to act as its agents.

It is asserted by counsel that the traveling public and the transportation companies have been so defrauded by the acts of the brokers in the selling of unused or alleged to be unused passage tickets, as to call for legislation of a protective character, of which this statute is the outcome. The tendency of the times undoubtedly is to rush to the legislature for a cure for all the grievances of citizens, whether real or imaginary, and many novel experiments in legislation are the result. But usually in case of wrongs penalties have been provided. It is novel legislation indeed that attempts to take away from all the people the right to conduct a given business because there are wrongdoers in it, from whose conduct the people suffer. But where in the statute is to be found the evidence that its purpose is to prevent fraud? "In the title of the act," answers counsel, and with that answer he has to be content. For while the act is entitled "Frauds in the sale of passage tickets," the body of the statute does not contain any reference to forged, altered, used or stolen tickets. The sale of such tickets is made a punishable offense under other sections of the Penal Code. The provisions of the act, therefore, have reference to the selling of valid tickets, regularly issued by a transportation company. Can the legislature declare such sales to be fraudulent, or prohibit them on the ground that it tends to prevent fraud? If the act prohibited is fraudulent, there can be no doubt that the legislature, under its police power, may provide for its punishment; but whether it may, under such power, interdict the sale of a valid ticket by one person to another upon the pretext that fraud will thus be prevented, presents a very different question. I confess I am unable to see how such a sale defrauds a transportation company. If a transportation company sells a ticket from New York to San Francisco, it undertakes to carry the holder from one

place to the other. It costs the company no more to carry one person than it does the other. How then can it be defrauded or in any way prejudiced by the transfer of such a ticket by the purchaser to another person? It is said that the prohibition of such a sale tends to protect the traveler from being defrauded. If it is a sale of a valid ticket, no fraud can possibly result, and if it is not a sale of a valid ticket, then the sale is fraudulent and is prohibited by other provisions of the Penal Code.

Only one prop remains which it is pretended can support the weight of this statute, and that is, that the penal laws not having proved sufficiently efficacious to wholly prevent fraud, an emergency is presented which justifies the taking away from the general public the right to engage in the business of ticket selling.

It is not contended that the business of ticket brokerage is in itself of a fraudulent character. The business can be honestly conducted; it has been so conducted in the past by honest men engaged in it; and the most that is asserted is that there are some men engaged in the business who have imposed on the public. The same assertion can be made with equal truth of every business, trade and profession. Because some coal dealers and vendors in sugar cheat in weight, and dealers in paints and oil in measurements, and in tobacco in quality, it has not hitherto, we venture to say, been thought the proper remedy to make it a felony for persons to hereafter engage in such business, unless they shall have been duly appointed as agents by the corporations manufacturing or producing the product.

Still another motive for this enactment is suggested, and that is that its real purpose is to enable transportation companies to compel others with which they may enter into pooling arrangements to preserve their agreement from secret violation, which is frequently the outcome under the present ticket brokerage system, which offers an avenue by which the weaker corporation to such an agreement can dispose of its tickets at a price lower than that agreed upon. This subject received

judicial attention in *Nashville, C. & St. L. Ry. Co.* v. *McConnell* (82 Fed. Rep. 65) and *Minnesota* v. *Corbett* (57 Minn. 345), where statutes, having apparently the same object in view as this one, were under consideration, as will appear from the following extract from the opinion : "It was also commonly believed that, in order to evade statutes designed to secure uniformity of rates and to prevent discriminations, some carriers of passengers were in the habit of placing large blocks of their tickets with 'scalpers,' ostensibly not their agents, for sale at cut rates.   To remedy these and similar abuses, real or supposed, this statute was passed.   That all its provisions have some relation to, and tendency to accomplish, this end, is quite clear."

Counsel argue that the helpfulness of the ticket broker in securing to the traveling public the benefits of such competition was of such a fraudulent character as to wholly justify the legislation, and appeal to the decisions quoted from in support of such contention.   But we pass for the present the subject of motive, to be again referred to when we come to consider whether, under the police power, the legislation can be justified.   Whatever the legislature's motive, the fact is, that it has passed an act which does not declare ticket brokerage unlawful, for it allows any person who may be fortunate enough to secure an appointment as agent for a transportation company to engage in ticket brokerage ; but the act does declare that if any person, other than an agent of a transportation company, undertakes to engage in the passenger ticket brokerage business he shall be guilty of a felony ; in other words, that it is unlawful for all citizens of New York to engage in the buying and selling of passage tickets unless empowered to do so by the written appointment of a transportation company.

Much has been said in argument with reference to this statute in a more agreeable vein, placing the statute in a somewhat more attractive form, but it is as well to go beneath the surface and get at the truth, which is that the statute was intended to and does in fact vest the control of the sale of

passage tickets within this state, not only of transportation companies doing business in this state, but throughout the world, exclusively in the hands of such companies.

The business of selling passage tickets continues, therefore, to be regarded as a lawful and legitimate business. Public policy is still declared to favor a business which recognizes the propriety of the middleman between the passenger and the transportation company, but the right to engage in it is denied to the general public.

The question then is whether the organic law prohibits legislation of this character.

Before referring to the provisions of the Constitution that it is confidently asserted condemn such legislation, it may not be out of place to note that the granting of monopolies or exclusive privileges to corporations or persons has been regarded as an invasion of the rights of others to follow a lawful calling and an infringement of personal liberty, from the times of the reigns of Elizabeth and James. The statute of 21 Jac., abolishing monopolies, has been from the time of its enactment regarded as a statutory landmark of English liberty, and that nation has jealously preserved it. It was a part of that inheritance which our fathers brought with them and incorporated into the organic law, to the end that the lawmaking power should be restrained from interference with it.

In this connection the language employed by Mr. Justice FIELD in *Butchers' Union Co.* v. *Crescent City Co.* (111 U. S. 746, 756, 757) is most instructive. " As in our intercourse with our fellowmen certain principles of morality are assumed to exist, without which society would be impossible, so certain inherent rights lie at the foundation of all action, and upon a recognition of them alone can free institutions be maintained. These inherent rights have never been more happily expressed than in the Declaration of Independence, that new evangel of liberty to the people : ' We hold these truths to be self-evident ' — that is so plain that their truth is recognized upon their mere statement — ' that all men are endowed ' — not by

edicts of emperors, or decrees of Parliament, or acts of Congress, but ' by their Creator, with certain inalienable rights' — that is, rights which cannot be bartered away, or given away, or taken away except in punishment of crime — ' and that among these are life, liberty and the pursuit of happiness, and to secure these' — not grant them but secure them — ' governments are instituted among men, deriving their just powers from the consent of the governed.' Among these inalienable rights, as proclaimed in that great document, is the right of men to pursue their happiness, by which is meant the right to pursue any lawful business or vocation, in any manner not inconsistent with the equal rights of others, which may increase their prosperity or develop their faculties, so as to give to them their highest enjoyment. The common business and callings of life, the ordinary trades and pursuits, which are innocuous in themselves, and have been followed in all communities from time immemorial, must, therefore, be free in this country to all alike upon the same conditions. The right to pursue them, without let or hindrance, except that which is applied to all persons of the same age, sex, and condition, is a distinguishing privilege of citizens of the United States, and an essential element of that freedom which they claim as their birthright. * * * In this country it has seldom been held, and never in so odious a form as is here claimed, that an entire trade and business could be taken from citizens and vested in a single corporation. Such legislation has been regarded everywhere else as inconsistent with civil liberty. That exists only where every individual has the power to pursue his own happiness according to his own views, unrestrained, except by equal, just, and impartial laws."

From the opinion of Mr. Justice MATTHEWS in *Yick Wo* v. *Hopkins* (118 U. S. 356, 370) the following is taken : " But the fundamental rights to life, liberty, and the pursuit of happiness, considered as individual possessions, are secured by those maxims of constitutional law which are the monuments showing the victorious progress of the race in securing to men

the blessings of civilization under the reign of just and equal laws, so that, in the famous language of the Massachusetts Bill of Rights, the government of the commonwealth ' may be a government of laws and not of men.' For, the very idea that one man may be compelled to hold his life, or the means of living, or any material right essential to the enjoyment of life, at the mere will of another, seems to be intolerable in any country where freedom prevails, as being the essence of slavery itself."

These principles have also been incorporated into the organic law of this state. Article 1, section 1 of the State Constitution reads as follows : " No member of this state shall be disfranchised, or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land, or the judgment of his peers."

Article 1, section 6 of the State Constitution provides that " no person shall ＊ ＊ ＊ be deprived of life, liberty or property without due process of law." The word " liberty," as employed in the provision of the Constitution quoted, was considered by this court in *In re Jacobs* (98 N. Y. 98) in a masterful opinion by Judge Earl. He said (pp. 106, 107) : " So, too, one may be deprived of his liberty and his constitutional rights thereto violated without the actual imprisonment or restraint of his person. Liberty, in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation. All laws, therefore, which impair or trammel these rights, which limit one in his choice of a trade or profession, or confine him to work or live in a specified locality, or exclude him from his own house, or restrain his otherwise lawful movements (except as such laws may be passed in the exercise by the legislature of the police power, which will be noticed later), are infringements upon his fundamental rights of liberty, which are under constitutional protection."

In *People* v. *Marx* (99 N. Y. 377) this court declared unconstitutional a statute that prohibited the manufacture and sale of any substitute for butter or cheese produced from pure unadulterated milk or cream. Judge Rapallo, speaking for the court, said : " Among these no proposition is now more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful industrial pursuits, not injurious to the community, as he may see fit. The term ' liberty,' as protected by the Constitution, is not cramped into a mere freedom from physical restraint of the person of the citizen, as by incarceration, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare."

In *People* v. *Gillson* (109 N. Y. 389) a statute was declared to be unconstitutional which prohibited the sale of any article of food, or offering or attempting to do so, upon any representation or inducement that anything else would be delivered as a prize, premium or reward to the purchaser. Judge Peckham, in delivering the opinion of the court, after considering the statute, said (p. 399): " A liberty to adopt or follow for a livelihood a lawful industrial pursuit, and in a manner not injurious to the community, is certainly infringed upon, limited, perhaps weakened or destroyed by such legislation."

Argument certainly is not needed in the light of these decisions to support the assertion that the " liberty " of this relator and other citizens of this state to engage in the business of brokerage in passage tickets is sought to be interfered with by the statute under consideration, for brokerage in such tickets has been a lawful business in this state for many years, and many persons have pursued it. It is still a lawful business, although the right to engage in it is limited to such persons as may be appointed by the transportation companies. The statute is, therefore, in contravention of the State Constitution, and is void unless its enactment by the legislature con-

17

stituted a valid exercise of the police power. That power is very broad and comprehensive, and has not as yet been fully described or its extent plainly limited, but it is exercised to promote the health, comfort, safety and welfare of society. In each of the last three cases cited it was invoked by counsel to sustain a statute, and it received very careful consideration at the hands of this court. It was held that the power, however broad and extensive, is not above the Constitution, in obedience to the commands of which the courts will protect the rights of individuals from invasion under the guise of police regulations, when it is manifest that such is not the object and purpose of the regulation ; and while it is the general province of the legislature to determine what laws and regulations are needed to protect the public health, comfort and safety, courts must be able to say, upon a perusal of the enactment, that there is some fair and reasonable connection between it and the ends above mentioned. Unless such relation exists, an enactment cannot be upheld as an exercise of the police power.

The doctrine of these cases was very recently considered and reasserted by this court in *Colon* v. *Lisk* (153 N. Y. 188), and its further discussion at this time would be a work of supererogation. Under the law of this state, therefore, it is the duty of the courts to examine legislation complained of as in violation of the rights secured to the citizens by the Constitution, for the purpose of ascertaining whether the health, morals, safety or welfare of the public justifies its enactment. In passing, it may be observed that while it is undoubtedly the rule that railroads, steamboats, warehouses and other associations of that nature, impressed with a public duty and intended to perform certain *quasi* public functions, may be the subject of legislative control and regulation so long as the legislature does not transcend the limit of State or Federal Constitution, still that rule is without application to the features of the statute before the court on this review. This inquiry involves such portion of the statute only as undertakes to prohibit citizens of the state from engaging in the brokerage

business in passage tickets. That portion of the statute certainly places no burden upon transportation companies, nor does it in any way regulate the manner in which transportation companies shall conduct their business or any part of it. The legislature has no jurisdiction to regulate the methods of business of foreign transportation companies, nor can it prevent them from selling their passage tickets in this state, but by this act it does undertake to prevent any citizen of this state from purchasing the passage tickets of foreign companies for sale to others, unless such citizen shall have been regularly appointed an agent by some transportation company. The right hitherto exercised by citizens to deal in passage tickets over transportation routes without, as well as within, this state, is sought to be cut off.

Again, it may be conceded that it is within the power of the legislature to regulate the manner in which certain kinds of business may be conducted ; that it may require one seeking to engage in a given pursuit to secure from the state, or one of its agents, a license ; that it may require one pursuing any particular occupation to pay a tax for the privilege of conducting his business ; and that, as a condition to the right of carrying on a business that, in the hands of incompetent persons, may be productive of injury to others, the legislature may require that before engaging therein, one must satisfy the public authorities that he is competent and morally qualified to conduct it. But none of these methods was adopted. No attempt is made to exclude persons of bad character from engaging in the business, nor are the public authorities given the right to determine, by examination or otherwise, the character of the person to be engaged in it ; but the transportation companies alone are invested with the power to allow whomsoever they will to engage in the business.

Nor can the contention be tolerated that because there have been, in times past, dishonest persons engaged in the ticket brokerage business, with the result that frauds have been perpetrated on both travelers and transportation companies, therefore the legislature can deprive every citizen

engaged therein of the "liberty" to further conduct such business. Stringent rules undoubtedly may be enacted to punish those who are guilty of dishonest practices in the conduct of such a business and the machinery of the law put in motion for its rigorous enforcement; but to cut up, root and branch, a business that may be honestly conducted to the convenience of the public and the profit of the persons engaged in it, is beyond legislative power.

If the law were otherwise no trade, business or profession could escape destruction at the hands of the legislature if a situation should arise that would stimulate it to exercise its power, for in every field of endeavor can be found men that seek profit by fraudulent processes. Transportation tickets have been forged it is said; so have notes, checks and bank bills. Railroad companies are no more bound to honor forged tickets than the alleged maker of a forged note is bound to pay it. An innocent person who suffers by parting with his money on a forged ticket has his remedy against the vendor just the same as has the bank that discounts a forged note. Such instances might be multiplied, but it would serve no good purpose, for it is well known that no business can be suggested through which innocent parties may not be occasionally victimized. But, because of that fact, honest men cannot be prevented from engaging in their chosen occupations.

Again, it is said that ticket brokers enable the railroads to engage in unfair competition. This is accomplished by the sale to the broker by a competing railroad, at much less than the regular rates, of a block of tickets that the broker is enabled to sell to his customers, and this to a certain extent takes travel from its competitors. An opinion is cited in which the court in another jurisdiction denounces the ticket scalper for engaging in a business of this character and pronounces such business fraudulent alike in its conception and operation; but we pass this opinion without other comment than to say that whatever may be regarded as the law in other jurisdictions, in this one it is well established that the public

1898.] People ex rel. Tyroler *v.* Warden of Prison. 133

N. Y. Rep.]  Dissenting opinion, per Bartlett, J.

welfare is best subserved by the encouragement of competition (*People* v. *Sheldon,* 139 N. Y. 263; *Judd* v. *Harrington,* Id. 105), and hence this so called reason furnishes no support to the claim that this legislation was for the public good.

I have now called attention to all the arguments that have been advanced in support of the claim that the provisions of the statute under consideration are so evidently intended for the public good as to constitute a valid exercise of the police power by the legislature, and those arguments seem so wholly without merit as to suggest that they constitute a mere pretext put forward to uphold legislation hostile to the *liberty* of the citizen, as that word is used in the Constitution. If the views expressed be well founded, it follows that it is the duty of the court to declare that portion of the statute we have considered to be in contravention of the Constitution and void.

The order should be reversed and the prisoner discharged.

Bartlett, J. (dissenting). This appeal is based upon the alleged unconstitutionality of chapter 506 of the Laws of 1897, entitled "An act to amend the Penal Code, relative to the sale of passenger tickets."

Chapter XII of title XV of the Penal Code, amended by this statute, is entitled, " Fraud in the sale of passage tickets." The relator insists that the act of 1897 violates article 1, section 1, of the State Constitution, which provides that no member of the state shall be disfranchised or deprived of his rights or privileges unless by the law of the land and the judgment of his peers; also article 1, section 6, of the State Constitution, providing that no person shall be deprived of life, liberty or property without due process of law; also the fourteenth amendment of the Constitution of the United States, which provides that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor deprive any person of life, liberty or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws; also article 3, section 1, of the State Constitution, vesting the legis-

lative power of the state in a senate and assembly ; also article 1, section 8, subdivision 3, of the Constitution of the United States providing that Congress shall have power to regulate commerce among the several states.

The learned counsel for the relator and appellant asks us to consider in the light of these constitutional prohibitions the act of 1897, which makes, as he insists, the pursuit of a business which for forty years prior to September 1st, 1897, was legitimate and lawful, a felony.

The business referred to is described in the relator's petition for the writ of habeas corpus as " selling and offering for sale, and procuring tickets, giving and purporting to give, the right to a passage and conveyance on vessels and railway trains."

It should be observed that the act of 1897 is merely an amendment of a chapter of the Penal Code containing some twelve sections, and inserts therein one new section and amends another.

It is not, in a general sense, new legislation, but engrafts some additional provisions upon statutory enactments that have existed in one form or another for forty years or more.

A short review of this legislation, which is not referred to in the briefs of counsel, or the opinion below, may be profitable at this time.

Chapter 470, Laws of 1857, is entitled " An act to prevent frauds in the sale of tickets to passengers upon railroads, steamboats and steamships," and provides that no person other than the agents or employees of the carriers named, duly appointed by them for that purpose, by a proper authority in writing, shall offer for sale, or sell within this state, any tickets, etc.

A violation of this act is made a misdemeanor, punishable by a fine of not less than one hundred dollars, or by imprisonment not less than three months, or by both such fine and imprisonment.

Chapter 103, Laws of 1860, is entitled " An act to prevent frauds in the sale of tickets upon steamboats, steamships and other vessels," and is confined to the sale of tickets upon vari-

ous vessels, and while longer and more comprehensive than the act of 1857, is similar in its restrictive provisions and makes the penalty for violation imprisonment in a state prison for a term of not more than two years, or by imprisonment in a county jail not less than six months.

Chapter 820, Laws of 1868, amends the act of 1857.

Chapter 201, Laws of 1876, is entitled " An act to prevent frauds in the sale of staterooms, berths and tickets upon steamboats, and steamships, and other vessels," and is in harmony with the previous legislation upon the general subject.

While these laws remained upon the statute book, and in 1881, the Penal Code was adopted (Ch. 676, Laws 1881), which in title XV, chapter XII contained practically the same provisions as the laws of 1857 and 1860.

Chapter 384, Laws of 1882, amended the Penal Code by repealing section 615, being the opening section of said chapter XII, but the remaining sections were retained, which forbade the sale of tickets by persons other than authorized agents of companies.

Chapter 593, Laws of 1886, repealed chapter 470, Laws of 1857 ; sections one, two, three, four, five, six, seven, nine and eleven of chapter 103 of the Laws of 1860, and chapter 201 of the Laws of 1876.

Chapter 662, Laws of 1892, amended sections 618 and 621 of the Penal Code, relating to this subject, by increasing the penalty for the violation of the statute to a maximum imprisonment of two years and declaring that offices kept for the purpose of selling tickets in violation of any provisions of the chapter are to be deemed disorderly houses.

This seems to have been the last legislation upon this general subject until chapter 506 of the Laws of 1897, the act now under consideration, which enacted a new section, six hundred and fifteen of the Penal Code in place of the old section repealed by chapter 384 of the Laws of 1882, and also amended section six hundred and sixteen.

While the argument based upon practical construction is not conclusive, it is entitled to great weight.

When we are confronted, as in this case, by a declared public policy of the state which has existed for more than a generation, its illegality ought to be made very clearly to appear before the court holds it to be in violation of constitutional provisions.

It may be stated in this connection that similar legislation exists in several other states, and has been uniformly sustained by the courts. (*Burdick* v. *People,* 149 Ill. 600; *State* v. *Corbett,* 57 Minn. 345; *Commonwealth* v. *Wilson,* 14 Philadelphia, 384.)

The only question presented for our decision at this time may be thus stated : Is it competent for the legislature, in the exercise of the police power and in regulating the sale of passage tickets by common carriers, to prohibit sales by ticket brokers, unless they are duly authorized to make such sales by the owners or charterers of the vessel, or by the company running the railway train upon which passage tickets are offered for sale ?

We are not now called upon to determine the privileges enjoyed by, or obligations imposed upon, common carriers by this legislation; nor are we to decide whether the individual who has purchased a ticket in good faith, with the intention of using the same, has been deprived of his property without due process of law when prohibited from selling his unused ticket, and compelled to resort to a more or less imperfect scheme of redemption by the individuals or corporations issuing it.

The relator is in no way concerned with these questions, and his appeal must stand or fall upon the proper construction of the law relating to the sale of passage tickets by ticket brokers. The statute might be void as to the passenger holding an unused ticket, and valid as to the ticket broker.

The court should express no opinion on this point.   We are not only confined to the single question pointed out, but we have nothing to do with those questions of fact that were presented with great ability by the learned counsel for the appellant, as they have no place in the record.

We have to deal with the legal question of legislative power

only, and are not judicially informed as to the facts that induced the legislature to act, save as they may be inferred from that which appears upon the face of the legislation, the validity of which is now challenged.

The acts prior to the Penal Code aver in their titles that they were enacted to prevent frauds in the sale of tickets to passengers upon railways and vessels, and the chapter of the Penal Code that has taken the place of these earlier statutes is entitled, " Fraud in the sale of tickets."

It may, therefore, be fairly and reasonably inferred from these declarations on the face of the statutes that the legislature was moved to act in order to prevent frauds upon passengers and common carriers.

As this record presents only the constitutionality of the act in question upon its face, we are not advised judicially of the evils which many years of legislation have sought to remedy.

So we come to the question whether it is competent for the legislature, in the exercise of the police power, in order to prevent frauds in the sales of passage tickets by land and water, to confine their sale to the individuals and corporations issuing them, or their duly authorized agents ?

In other words, has the relator such an inalienable right to deal in these tickets by purchase and sale that to deprive him of it is to strip him of his liberty, rights, privileges and property without the judgment of his peers and due process of law ?

The appellant insists that to confine the sale of tickets to the common carriers, or their agents, not only works these results as to him, but is to discriminate against every citizen and build up a monopoly.

We are cited in a learned brief to many cases in the Supreme Court of the United States, our own court, and other courts, to sustain this position.

The reasonable limits of this discussion will not permit a review of these authorities, but I am of opinion they have no application to the case at bar.

18

It has been often remarked by judicial writers that it is difficult and undesirable to define the limits of the police power.   It has been said to be "the general power of a government to preserve and promote the public welfare even at the expense of private rights."   (Am. & Eng. Enc. of Law, vol. 18, p. 740.)

Judge Cooley, in his Constitutional Limitations (4th ed.), 719, says: " The limit of the police power in these cases must be this : The regulations must have reference to the comfort, safety and welfare of society."

The Supreme Court of Illinois, in *Town of Lake View* v. *Rose Hill Cemetery Co.* (70 Ill. 194), referring to the police power, said :

" It may be assumed it is a power co-extensive with self-protection, and is not inaptly termed ' the law of paramount necessity.'   *   *   *   It may be said to be that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort, safety and welfare of society."

The Supreme Court of the United States (*In re Rahrer*, 140 U. S. 554) pointed out that it is within the power of the state to impose restraints and burdens upon persons and property in conservation and promotion of the public health, good order and prosperity.

It was, as it seems to me, a reasonable and proper exercise of the police power by the legislature, when seeking to put an end to frauds in the sale of passage tickets, to require carriers, who are usually created by legislation, to sell their own tickets either directly or through duly authorized agents.

It is always the fact that the exercise of the police power by the legislature leads to loss and inconvenience in the cases of many individuals ; it is the inevitable result and must be endured unless personal and property rights are invaded to such an extent that constitutional provisions are violated.

The relator insists that he is deprived of his property without due process of law.

We do not have here presented, as before intimated, the question which might arise in the case of the purchaser of a

ticket in good faith intending to use the same, but, being unexpectedly prevented from so doing, desires to sell it.

This relator has no such special property in the ticket as the supposed case discloses, but is a mere dealer or speculator in these symbols or tokens.

The relator claims the same right to traffic in passage tickets as he would have to buy and sell cotton, grain or any other article of personal property that can be seen and handled.

The nature of a passage ticket has been repeatedly considered by this court. In *Hibbard* v. *N. Y. and E. R. R. Co.* (15 N. Y. 455, 466) the plaintiff was ejected from the train because he refused to show his ticket.

The plaintiff recovered damages below, but this court reversed, and in its opinion said:

" The ticket is the property of the railroad company, and is a part of the means by which it conducts its business. It is delivered to the passenger to be held by him, temporarily, for a special purpose, and who, to that extent, acquires a special property in it.

" When the journey is ended, or about to end, it is to be redelivered to the conductor.

" It serves a threefold purpose : it is evidence in the passenger's hands that he has paid his fare and has a right within the cars ; it insures the payment of the passage money by all who take seats, and when it is redelivered to the company it becomes a voucher in its hands, against the office or agent who issued it, in the adjustment of its accounts."

It thus appears that the original and legitimate function of the ticket is to carry out a transaction between the carrier and the passenger, the ticket being the property of the carrier, while the passenger is entitled to retain it in his possession until the completion of his journey.

In *Quimby* v. *Vanderbilt* (17 N. Y. 306) this court held that passage tickets are generally to be regarded as tokens rather than contracts, and are not within the rule excluding parol evidence to vary a written agreement.

In *Rawson* v. *Penn. Railroad Co.* (48 N. Y. 212) the court held that a ticket does not generally contain any contract and is not intended to.   It is a mere token or voucher adopted for convenience to show that the passenger has paid his fare from one place to another.

I am of opinion that neither the act of 1897, nor the statute it amends, deprives the relator of his property without due process of law.

The relator has no such vested right as a ticket broker to traffic in the purchase and sale of these symbols or tokens which are the property of the carrier, as has the merchant dealing in goods, wares and merchandise.

If the legislature deemed this interference in the business of the common carrier relating to the sale of passage tickets as leading to great frauds and abuses, it was competent for that body to put an end to them even if, as may be possible in the relator's case, ticket brokers were unfavorably affected who were in no way responsible for the evils sought to be remedied.

This is not the case of the legislature saying to the merchant, you shall no longer buy and sell and get gain — you must henceforth abstain from dealing in those articles of merchandise the handling of which by land and sea constitutes the commerce of the world.

This is the case of the legislature saying to the citizen, you must not interfere with the due and orderly conduct of business between the common carrier and the passenger in the sale and purchase of the symbol or token used for the purpose, as it leads to frauds upon not only the common carrier and the first-class passenger, but the emigrant as well (see Penal Code, § 626), and in the exercise of the police power to protect the traveling public, we enact that the passage ticket of the common carrier shall be sold only by it or its agents.

In sustaining this exercise of the police power it is not necessary to refer in detail to the legislation regulating the conduct of business in various ways in order to prevent fraud

and promote the welfare of society, which has been uniformly sustained in this and other states.

It is further insisted on behalf of the relator that the act of 1897 is unconstitutional because it amounts to a regulation of commerce among the several states by the legislature of this state.

It is difficult to understand how any such result is accomplished by this legislation.

It has often been said that legislation by a state may, in a great variety of ways, affect commerce and persons engaged in it without constituting a regulation of it within the meaning of the Constitution of the United States. (*Kidd* v. *Pearson*, 128 U. S. 1, 23; *Hall* v. *De Cuir*, 95 U. S. 485, 487, 488; *Sherlock* v. *Alling*, 93 U. S. 99, 103; *State Tax on Railway Gross Receipts*, 15 Wall. 284; *Munn* v. *Illinois*, 94 U. S. 113; *C., B. & Q. R. R. Co.* v. *Iowa*, 94 U. S. 155; *Pound* v. *Turck*, 95 U. S. 459.)

The act of 1897 does indeed affect ticket brokers who were, in a sense, engaged in interstate commerce, but it cannot properly be said that it was an effort on the part of the legislature of this state to regulate commerce, within the meaning of the Federal Constitution. The traveling public is at liberty to freely come and go as heretofore, and the fact that they are prohibited from dealing with the unauthorized ticket broker offers no obstacle to interstate commerce.

The act of 1897 deals with the ticket broker as a resident of this state carrying on his business here, and there is no attempt to usurp the powers of Congress to regulate interstate commerce.

It is finally argued on behalf of relator that the legislation offends the Constitution of this state because it is practically an abdication of governmental functions in favor of private individuals and corporations.

The statement of the argument is that the legislature has left it to private agencies to determine who shall and who shall not be permitted to carry on the business of selling tickets.

This argument refutes itself.

The legislature, in the constitutional exercise of the police power, has said to the common carrier, you must select and duly commission the agents who are to sell your passage tickets, and no one else can engage in that business.

This is certainly not an abdication of governmental functions, but a wise and proper exercise of them, as I view the situation.

I have carefully considered the elaborate argument presented in the appellant's brief, but see no reason to disagree with the conclusions reached by the learned Appellate Division.

The order appealed from should be affirmed.

Martin, J. (dissenting). Recognizing the justice of recent criticisms upon the increase of long and argumentative dissenting opinions in this court, still, the importance of the principle announced in the decision of this case demands a statement of the reasons which prevent my concurring with the majority.

The case involves the validity of a statute which continues a protection to the public and to transportation companies against fraud in the sale of passage tickets which has existed in this state in substantially the same form for more than forty years. Therefore, the present statute cannot be held unconstitutional without practically determining that for all that time the affairs of this state in that respect have been controlled by statutes which were invalid as being in excess of the powers of the legislature to enact. The passage and continuance upon the statute books of this and similar statutes for so many years show that during that time a legislative policy has prevailed in this state which has been sanctioned by numerous legislative acts. It has never been questioned by the courts, and has been acquiesced in by the departments of the state government. This constitutes such a practical construction of the constitutional provisions invoked by the appellant as to justify this court in holding the statute to be within the police power of the state, especially as similar statutes had been in

force for many years when the present Constitution was adopted. (*People ex rel.* v. *Dayton*, 55 N. Y. 367, 378; *People* v. *Home Ins. Co.*, 92 N. Y. 328, 337; *Matter of W. S. A. & P. R. R. Co.*, 115 N. Y. 442, 447; *People ex rel.* v. *Murray*, 149 N. Y. 367, 376.)

The real inquiry here presented is whether the legislature may provide that steamboat and railroad tickets shall not be sold by irresponsible or unknown persons, thus exposing travelers to fraud, and require them to be so sold that the companies issuing them shall be responsible to the traveler who purchases them. While the statute forbids persons other than the companies or their duly constituted agents making such sales, still its purpose was to compel the companies to sell their own tickets and thus become responsible. Manifestly, the method prescribed by this act was the only efficient one that could be adopted to secure the end sought. If the companies had merely been forbidden to permit such sales, their permission could never be established, and thus the purpose of the statute would be thwarted.

The single question presented is whether the legislature was authorized to enact a statute requiring railroad and steamboat companies, or, where the passage extends over more than one line, one of such companies, to sell the tickets for such passage by their duly constituted agents, and forbidding such sales by persons not sustaining that relation, under penalty of imprisonment. If this act is in conflict with the fundamental law, it is for the reason that it affects the liberty of the citizen to engage in a legitimate employment or business in a lawful way, or because it is destructive of some property right which he lawfully possesses.

It has been asserted by counsel that the business of ticket brokerage has been a legitimate one in this state for more than forty years. With that statement I am unable to agree. During that entire time a law has existed making the sale of railroad and steamboat tickets by others than the companies or their properly authorized agents a crime.

Nor do I understand how it can be properly said that rail-

road or steamboat tickets are property, within the common acceptation of that term, when in the hands of others than passengers, as during all those years the statute has continuously declared that passage tickets should not become property in the hands of others, at least, so as to include the ordinary right of sale. Their right of sale was limited to the company over whose route the traveler desired to pass, or, where the route was over several lines, to one of the companies over whose line the passenger intended to travel.

The manifest purpose of this statute was to prevent fraud in the sale of passage tickets, and thus protect the purchaser and companies as well. I do not see how it can be correctly said that the legislature was silent as to the motive of passing these various acts. In each the title of the act disclosed that its purpose was to prevent fraud in the sale of passage tickets. The title of an act affords means of determining the legislative intent, and its help cannot be rejected as being extrinsic and extra-legislative, as it bears upon its meaning and purpose. (Sutherland on Statutory Construction, § 211; *People ex rel.* v. *Wood,* 71 N. Y. 374.)

That the sale of tickets by brokers has long been a source of fraud both upon the traveling public and the companies issuing them, is a matter of common knowledge, and of its existence there can be no doubt. Indeed, it is doubtful if the business would exist but for the profit derived from improper or fraudulent sales. The fraud of ticket brokers assumes various forms, such as changing tickets which are not transferable by the erasure of the name, the place of destination, or the date, and substituting others, and by otherwise changing the tickets, or by obliterating the dates so as to render their improper use possible. Moreover, the existence of such brokers incites the stealing of tickets, and encourages the employees of the companies in defrauding their employers by furnishing a market for stolen tickets and those not canceled by dishonest officers. That the sale of such tickets is a fraud upon both the carrier and the honest traveler, cannot be successfully denied. Again, when a passenger loses his ticket,

instead of its being restored to him, resort may at once be had to those agencies to realize upon it.   Hardly a week passes when the public prints do not contain one or more accounts of the grossest fraud upon honest but unwary travelers, which would not occur but for their existence.   Therefore, the existence of ticket brokers is a continual menace to both passengers and carriers.   It tends to encourage forgery, larceny, the receipt and sale of stolen and fraudulent tickets, the perpetration of frauds upon travelers, and is clearly a disadvantage to the honest traveler as well as to the carrier.   Hence, the necessity for this statute is obvious, and I think the legislature was wise in adopting it.

While every person has a right to pursue in a legitimate manner any lawful calling he may select, and the state can neither compel him to adopt any particular calling nor prohibit his engaging in any legitimate business, still, it, in the exercise of its police power, is authorized to subject all occupations to such restraint as may be necessary to prevent their becoming harmful to the public, and where an occupation threatens public injury and its suppression is essential to the public welfare, the state may prevent its pursuit.   ( *Wynehamer* v. *People*, 13 N. Y. 378, 487; *Metropolitan Board* v. *Barrie*, 34 N. Y. 657.)

The state has a right to reasonably control the manner in which public corporations shall transact their business, and to protect the public against fraud.   This statute does nothing more.   Its effect is to require railroad and steamboat companies to sell their own tickets in a manner that will render them responsible to the purchaser for any fraud or mistake that may be perpetrated or may occur.   The property and business of these companies is clothed with a public interest which makes them of public consequence, affecting the community at large, and, hence, they may be controlled by any police regulation which is necessary to secure the public good. (*People* v. *Budd*, 117 N. Y. 1; *People ex rel.* v. *B. & A. R. R. Co.*, 70 N. Y. 569; *Munn* v. *Illinois*, 94 U. S. 113.)   It is, therefore, reasonable that the state may provide any pre-

ventive remedy necessary when the frequency of fraud or the difficulty in circumventing it is so great that no other means will prove efficacious. A regulation which is instituted for the purpose of preventing fraud or injury to the public and which tends to furnish such protection is clearly constitutional. This proposition is sustained by numerous authorities in this state and elsewhere and is an important element of the police power which is vested in the legislature.

It seems clear that the judgment in this case should be upheld upon the grounds :

1. Railroad and steamboat tickets can in no proper sense be regarded as property in which third persons have any vested interest. They are mere tokens or evidences of a right to transportation in which even the traveler who has purchased one has but a special interest and to which the companies have title and the ultimate right of possession. (*Hibbard* v. *N. Y. & E. R. R. Co.*, 15 N. Y. 455, 466; *Quimby* v. *Vanderbilt*, 17 N. Y. 306; *Rawson* v. *Pa. R. R. Co.*, 48 N. Y. 212.)

2. The sale of railroad and steamboat tickets by persons other than the companies or their agents as a business is not an employment in which they have any unqualified right to engage. A ticket is a mere incident to the business of the companies in transporting passengers. Like a baggage check, it is merely a method adopted by them for the transaction of their own business. The ticket itself possesses none of the ordinary elements of property and cannot, without the consent of the companies, form the basis of a legitimate independent business. At most it is but an evidence of the arrangement between the companies and their passengers in which others have no lawful interest. No right to transfer is given, and, generally, none is intended. To hold that every person has a constitutional right to interfere with the relations between passengers and carriers, which is superior to the control of the legislature, would result in extending the restraints imposed upon the lawmaking power much farther than they have hitherto been supposed to exist, and would be an interference with the power vested in the legislative

branch of the state government that is wholly unwarranted. Third persons have no constitutional right to interfere with the relations between the carrier and passenger by the purchase and sale without its consent of tickets issued by the former, and to establish such a right would be unauthorized by any existing principle of constitutional law. It is true the act recognizes the right of third persons to make sales of passage tickets, but that right is a limited one and can be properly exercised only by an agent of one of the companies furnishing the traveler with the transportation for which the ticket is purchased. But it is to be observed that as such sales are to be made by one of the companies furnishing the transportation, the company making it becomes responsible to the passengers and other carriers for any fraud perpetrated by its agent, and is in harmony with the general purpose of the act.

3. In the exercise of its police power the state was authorized to prevent the pursuit of the occupation of ticket brokers upon the ground that it was harmful to the public, and the difficulty in circumventing the fraud which attended it was so great that no other efficient means could be found.

4. As railroad and steamboat companies are public corporations, or at least their business is of such public interest as makes it of public consequence, the legislature had power to control their business by any regulation which was necessary to secure the public good. (*People* v. *King*, 110 N. Y. 418; *People* v. *Budd*, 117 N. Y. 1; *People* v. *Ewer*, 141 N. Y. 129; *People ex rel.* v. *Warden*, 144 N. Y. 529; *People* v. *Havnor*, 149 N. Y. 195; *Grannan* v. *Westchester Racing Assn.*, 153 N. Y. 461.) The regulation instituted by this statute was for the purpose of preventing fraud and consequent injury to the public; it tends to furnish such protection, and is clearly within the police power of the state. For these reasons I am of the opinion that the act under consideration is constitutional and should be upheld.

Moreover, if this act is unconstitutional, many other statutes which have hitherto been regarded as valid and a part

of the existing law of the state are also unconstitutional. This may be illustrated by reference to a few of the many statutes which fall within the principle of this decision. The taking of any conveyance of lands from any person not being in the possession thereof, while they are the subject of controversy or suit, is a crime. (Penal Code, § 129.) It is a crime to buy or sell any title to lands, real or pretended, unless the grantor or his predecessors in title have been in possession for the space of a year before such sale. (§ 130.) It is a crime to solicit life insurance without a certificate of authority, to issue a policy after a certificate to do business within the state has been revoked, to act for a foreign insurance company which has not designated the superintendent of insurance as an attorney upon whom process may be served, or to act for any foreign corporation not authorized to do business in this state. (Penal Code, §§ 577c, 577i, 577j, 593.) It is also made a crime to manufacture or sell oleomargarine made in imitation of dairy butter (L. 1885, ch. 183); to exhibit a female child as a dancer or in a theatrical exhibition, or to consent thereto (Penal Code, § 292); to exclude citizens by reason of race, color, etc., from the equal enjoyment of any privilege furnished by owners of places of amusement (§ 383); to charge for elevating grain a price greater than that fixed by law (L. 1888, ch. 581); to engage in the trade or business of plumbing without registration (L. 1892, ch. 602); not to furnish water at one or more places on each floor in tenement houses in the city of New York, occupied by families (L. 1882, ch. 410, as amended by ch. 85, L. 1887); to sell milk which does not reach a prescribed standard, whether adulterated or pure (L. 1884, ch. 202); to sell vinegar which contains any artificial coloring, whether wholesome or otherwise (L. 1889, ch. 515); and for barbers to work on Sunday, except in the city of New York and the village of Saratoga Springs (L. 1895, ch. 823). If the statute under consideration invades the liberty or property of the individual, it is obvious that the statutes to which we have adverted are subject to the same criticism, and yet most, if not all, of them have been held to be constitutional

and their enactment to be within the police power of the state, as will be seen by examining the following, which are a few of the many cases bearing upon the subject: *Danziger* v. *Boyd* (120 N. Y. 628); *Dawley* v. *Brown* (79 N. Y. 390); *People* v. *Cipperly* (101 N. Y. 634); *People* v. *Arensberg* (105 N. Y. 123); *People* v. *King* (110 N. Y. 418); *People* v. *Budd* (117 N. Y. 1); *People* v. *Ewer* (141 N. Y. 129); *People ex rel.* v. *Warden* (144 N. Y. 529); *Health Department* v. *Rector* (145 N. Y. 32); *People* v. *Girard* (145 N. Y. 105); *People* v. *Havnor* (149 N. Y. 195). Indeed, if the principle of this decision is to be regarded as the established law of this state, it renders invalid many, if not all, of the statutes creating offenses where the act made a crime was not such at common law. No such principle has any proper place in the jurisprudence of this state. In the language of ANDREWS, J.: "It is not a good objection to a statute prohibiting a particular act and making its commission a public offense that the prohibited act was before the statute lawful or even innocent, and without any element of moral turpitude. It is the province of the legislature to determine in the interest of the public what shall be permitted or forbidden, and the statutes contain very many instances of acts prohibited, the criminality of which consists solely in the fact that they are prohibited, and not at all in their intrinsic quality." (*People* v. *West*, 106 N. Y. 293, 296.)

In considering this case, it should be remembered that a statute cannot be declared unconstitutional, unless it can be shown beyond reasonable doubt that it is in conflict with some particular provision of the organic law, nor until every reasonable mode of reconciliation with the Constitution has been resorted to, and reconciliation has been found impossible. The presumption of constitutionality attaches to every statute passed by the legislature, and the burden of establishing its unconstitutionality rests upon and must be borne by the party asserting it. (*People ex rel.* v. *Supervisors*, 147 N. Y. 1.) It is for the legislature to determine what laws and regulations are needed for the protection of the public, and if its

measures are calculated and appropriate to accomplish that end, the exercise of its discretion is not the subject of judicial review.

Applying to this case the principles already stated, it is obvious that the statute in question was within the police power of the state. Its necessity to the public welfare was for the legislature to determine, and, as it has a clear relation to that end, its propriety is not subject to review by this court. To hold that this act is unconstitutional would establish a principle which would impair or destroy nearly every statute that has for its purpose the prevention of fraud. It would practically annihilate the police power of the legislature, and make the courts administrators of that power instead of the body in which it is vested by the Constitution. Besides, if the cases passing upon the validity of the statutes, to which we have called attention, were correctly decided, they establish a principle which, if applied in this case, requires us to hold that this act was a proper exercise of the police power by the legislature, and that it is, consequently, valid.

The result of this action is of slight importance in comparison with the principles promulgated as the law of this state. An arbitrary and unauthorized interference by the judiciary with the administrative affairs of the state is fraught with quite as much danger as would follow legislative interference with judicial affairs. Neither can occur without affecting the stability and efficiency of our state government. The legislative power of the state is vested in the senate and assembly. When courts seek to control the action of the legislature or, in effect, to repeal its statutes by holding them in conflict with some non-existent or doubtful constitutional limitation, their action ceases to be judicial and becomes mere usurpation.

I think the order should be affirmed.

Parker, Ch. J., reads for reversal of order and discharge of prisoner; O'Brien, Haight and Vann, JJ., concur. Bartlett and Martin, JJ., read for affirmance, and Gray, J., concurs.

Order reversed, and prisoner ordered discharged.