THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM J. RODGERS, Respondent, *v.* BIRD S. COLER, as Comptroller of the City of New York, Appellant.

1. APPEAL — DISCRETIONARY ALLOWANCE OF MANDAMUS. Where the court below has the power to grant a mandamus as a matter of discretion, its action in allowing the writ is not reviewable by the Court of Appeals.

2. CONSTITUTIONAL LAW — NON-COMPLIANCE WITH LABOR LAW AS TO PREVAILING RATE OF WAGES, NO DEFENSE TO MANDAMUS TO COMPEL PAYMENT OF AMOUNT DUE ON MUNICIPAL CONTRACT. A municipal contractor who has fully performed his contract for grading a public street and, as provided therein, has received from the proper authorities a certificate showing that the contract price agreed to be paid has been earned, may compel the city to pay the amount due by mandamus, although he has failed to comply with his stipulation required by the Labor Law (L. 1897, ch. 415, § 3, as amd. L. 1899, chs. 192, 567), that he will pay his workmen not less than the prevailing rate of wages in the locality, and if he fails to pay such rate the contract shall be void, since the Labor Law, so far as it relates to such a case, is unconstitutional: *First,* because in its actual operation it permits and requires the expenditure of the money of the city or that of the local property owner for other than city purposes; *second,* because it invades rights of liberty and property in that it denies to the city and the contractor the right to agree with their employees upon the measure of their compensation, and compels them in all cases to pay an arbitrary and uniform rate which is expressed in vague language, difficult to define or ascertain and subject to constant change from artificial causes; *third,* because it virtually confiscates all property rights of the contractor under his contract for breach of his engagement to obey the statute, and it attempts to make acts and omissions penal which, in themselves, are innocent and harmless. It, in effect, imposes a penalty upon the exercise

1

by the city or by the contractor of the right to agree with their employees upon the terms and conditions of the employment.

3. Agreement that Contract Shall be Void for Violation of Labor Law no Defense to Proceeding.  The fact that the contractor stipulated that the contract should be void in the event of a violation of the Labor Law is no defense to the proceeding, since the obligation and the legal effect of a promise or engagement imported into a contract by force of a statute, whereby the contracting parties agree to obey or execute some law, depends upon the validity of the law, and such a stipulation cannot survive the statute upon which it is founded, but falls with it.

*People ex rel. Rodgers* v. *Coler,* 56 App. Div. 98, affirmed.

(Argued January 7, 1901; decided February 26, 1901.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department, made December 14, 1900, reversing an order of Special Term denying the relator's motion for a peremptory writ of mandamus commanding the comptroller to deliver to him a warrant on the chamberlain of the city of New York for the payment of $2,863, the amount earned by the relator under a contract with the city for regulating and grading One Hundred and Thirty-fifth street from Amsterdam avenue to the Boulevard, and granting relator's motion for the writ.

The papers upon which the relator made the application show that on the 5th day of February, 1900, he made and entered into a contract with the city for regulating and grading that part of the street above described.  The contract provided that in order to prevent disputes and litigation the chief engineer of highways should, in all cases, determine the amount and quantity of the several kinds of work which were to be paid for under the contract, and all questions in relation to his work and the construction thereof, and that his estimate and decision should be final and conclusive upon the contractor and a condition precedent to his right to receive any money under the contract.  It is alleged that the relator proceeded to perform and carry out this contract and prior to the application had performed the same according to his promise and to the satisfaction of the commissioner ; that subsequently the chief engineer in charge of the work and

the commissioner of highways made their certificate in writing that there was earned under the contract, in accordance with the terms thereof, by the relator and then payable to him, the sum of $2,863.00. This certificate was filed in the office of the comptroller, who thereupon drew his warrant on the chamberlain for that sum, but refused to deliver the same to the relator, or to make the payment under the contract. The refusal of the comptroller is based entirely upon the fact alleged that the relator in the performance of the contract violated certain provisions of the Labor Law (Chap. 415 of the Laws of 1897, as amended by chap. 192 and chap. 567 of the Laws of 1899).

The following are, in substance, the provisions of this statute so far as they have any relation to the present case :

1. The wages to be paid for a legal day's work, as hereinbefore defined, to all classes of such laborers, workmen or mechanics upon all such public work or upon any material to be used upon or in connection therewith shall not be less than the prevailing rate for a day's work in the same trade or occupation in the locality within the state where such public work on, about or in connection with which such labor is performed in its final or completed form is to be situated, erected or used. Each said contract hereafter made shall contain a stipulation that each such laborer, workman or mechanic employed by such contractor, sub-contractor, or other person on, about or upon such public work shall receive such wages herein provided for.

2. Each contract for public work hereafter made shall contain a provision that the same shall be void and of no effect unless the person or corporation making or performing the same shall comply with the provisions of this act, and no such person or corporation shall be entitled to receive any sum, nor shall any officer, agent or employee of the state or of a municipal corporation pay the same or authorize its payment from the funds under his charge or control to any such person or corporation for work done upon any contract which in its form or manner of performance violates the provisions of this section.

3. Any officer, agent or employee of this state, or of a municipal corporation therein, having a duty to act in the premises, who violates, evades or knowingly permits the violation or evasion of any of the provisions of this act, shall be guilty of malfeasance in office, and shall be suspended or removed by the authority having the power to appoint or remove such officer, agent or employee, otherwise by the governor. Any citizen of this state may maintain proceedings for the suspension or removal of such officer, agent or employee, or may maintain an action for the purpose of securing the cancellation or avoidance of any contract which, by its terms or manner of performance, violates this act, or for the purpose of preventing any officer, agent or employee of such municipal corporation from paying or authorizing the payment of any public money for work done thereupon.

The contract was framed in compliance with these provisions of the law and contains the following stipulation : "The wages to be paid for a legal day's work, as hereinbefore defined, to all classes of such laborers, workmen or mechanics upon all such public work, or upon any material to be used upon, or in connection therewith, shall not be less than the prevailing rate for a day's work in the same trade or occupation in the locality within the state where such public work on, about or in connection with which labor is performed in its final or completed form is to be situated, erected or used. It is further agreed that each such laborer, workman or mechanic employed by such contractor, sub-contractor or other person in, about or upon such public work shall receive the wages hereinafter set forth. It is further agreed that this contract shall be void and of no effect unless the person or corporation making or performing the same shall comply with the provisions of the Labor Law. * * * The contract is to be void and of no effect unless the rate of wages specified in section three of said Labor Law is paid, and where laborers are employed preference is to be given to citizens of the state of New York, as provided in section thirteen thereof."

The contractor paid to the persons employed by him in

execution of the contract wages fixed as to amount by mutual
agreement, and it is conceded that he paid all that was
demanded of him or that he agreed to pay. But since it was
conceded that the contractor did not in all cases pay the pre-
vailing rate, the court at Special Term held that the contract
and the law were violated and that the relator was not entitled
to the writ. The Appellate Division, by a divided court,
reversed the order and granted the relator's application, and
from this order the corporation has appealed to this court.

*John Whalen, Corporation Counsel* (*Theodore Connoly*
and *Terence Farley* of counsel), for appellant. By the express
provisions of section 3 of chapter 567 of the Laws of 1899 the
defendant is prohibited from complying with the relator's
demand. (*The Marie Celeste*, 2 Lowell [U. S.], 316.) The
relator did not show clear legal right to a mandamus. (*Mat-
ter of Freel*, 148 N. Y. 165 ; *People ex rel.* v. *Mayor, etc.*,
144 N. Y. 63 ; *People ex rel.* v. *Coler*, 34 App. Div. 167;
*People ex rel.* v. *Board of Aldermen*, 18 Misc. Rep. 533 ; *Mat-
ter of Sheehan* v. *Long Island City*, 11 Misc. Rep. 487 ;
*Weston* v. *City of Syracuse*, 158 N. Y. 274 ; Merrill on Man-
damus, § 17 ; Spelling's Extra. Relief, § 1375 ; High on Extra.
Leg. Rem. § 339 ; Wood on Mandamus, 68 ; 14 Am. & Eng.
Ency. of Law, 176 ; *Ray* v. *Wilson*, 14 L. R. A. 773.) The
provisions of the Labor Law requiring contractors or munici-
pal corporations to pay their laborers, workmen and mechanics
the prevailing rate of wages is not unconstitutional. (*Wil-
liams* v. *Eggleston*, 170 U. S. 304 ; *Matter of Protestant E.
School*, 46 N. Y. 181 ; *People* v. *Phyfe*, 136 N. Y. 554;
*Frederick* v. *Groshen*, 30 Md. 436 ; *Groff* v. *Frederick City*,
44 Md. 67 ; *State Bank* v. *Madison*, 3 Ind. 43 ; *Luehrman*
v. *Shelby County Taxing Dist.*, 2 Lea, 425 ; *Berlin* v. *Gor-
ham*, 34 N. H. 266.) The legislation in question can be sus-
tained on the ground that the business of making and repair-
ing public highways is affected with a public interest, and as
such is subject to the regulations prescribed by the police
power of the state. (*Munn* v. *Illinois*, 94 U. S. 113 ; *Allnutt*

v. *Inglis*, 12 East, 527 ; *People* v. *Budd*, 117 N. Y. 1 ; *Budd* v. *State*, 143 U. S. 517 ; *Beekman* v. *S. & S. R. R. Co.*, 3 Paige, 45 ; *Chicago, B. & Q. R. Co.* v. *Iowa*, 94 U. S. 155 ; *B. E. S. R. R. Co.* v. *B. St. R. R. Co.*, 111 N. Y. 132 ; *Perrine* v. *C. & D. C. Co.*, 50 U. S. 172 ; *Freeholders* v. *State*, 24 N. J. L. 718 ; *Snell* v. *Chicago*, 130 Ill. 413.) The Labor Law is not unconstitutional because of the eight-hour provision. (*People* v. *Phyfe*, 136 N. Y. 554 ; *State* v. *McNally*, 48 La. Ann. 1450 ; *Holden* v. *Hardy*, 14 Utah, 71 ; 169 U. S. 366 ; *Utah* v. *Holden*, 14 Utah, 96 ; *Short* v. *B. B. & C. M. Co.*, 57 Pac. Rep. 720 ; *Matter of Dalton*, 59 Pac. Rep. 336 ; *Munn* v. *Illinois*, 94 U. S. 123 ; *Sinking Fund Cases*, 99 U. S. 718 ; Cooley on Const. Lim. [6th ed.] 202 ; *Westervelt* v. *Gregg*, 12 N. Y. 209 ; *Davidson* v. *New Orleans*, 96 U. S. 102.) Whether the act in question be constitutional or not, the relator is bound by the terms of his contract, and, having received its benefits, is estopped from claiming that it is illegal. (*Mayor, etc.*, v. *Sonneborn*, 113 N. Y. 423 ; *City of Buffalo* v. *Balcom*, 134 N. Y. 532 ; *B. G. L. Co.* v. *Claffy*, 151 N. Y. 24 ; *People ex rel.* v. *Beck*, 10 Misc. Rep. 79 ; *Bertholf* v. *O'Reilly*, 74 N. Y. 517.) The relator has an adequate remedy at law. (*People ex rel.* v. *Bd. Education*, 60 Hun, 487 ; 148 N. Y. 766.)

*L. Laflin Kellogg* and *Alfred C. Petté* for respondent. The provisions of the contract requiring the contractor to comply with the so-called " Labor Law " are illegal, and the statute requiring their insertion (Chap. 415 of the Laws of 1897 as amended) is unconstitutional and void. (*Holden* v. *Hardy*, 169 U. S. 366 ; Const. N. Y. art. 1, §§ 1, 6 ; Const. U. S. art. 14, § 1 ; *People* v. *Fisher*, 14 Wend. 10 ; *Curran* v. *Galen*, 152 N. Y. 33 ; *Butchers' U. S. H. Co.* v. *Crescent City Co.*, 111 U. S. 746 ; *Matter of Jacobs*, 98 N. Y. 98 ; *People* v. *Gillson*, 109 N. Y. 389 ; *Colon* v. *Lisk*, 153 N. Y. 188 ; *People* v. *Hawkins*, 157 N. Y. 1.) The relator has not and could not waive his right to question the constitutionality of the statute by voluntarily entering into the contract contain-

ing the illegal provision that he would comply with the pro-
visions of the " Labor Law," and that the contract should be
void and of no effect unless the rate of wages specified was paid.
(Cooley on Const. Lim. 335; *Phelps* v. *Phelps*, 72 Ill. 545;
*Recht* v. *Kelly*, 82 Ill. 147; *Branch* v. *Tomlinson*, 77 N. C.
·388; *Kneettle* v. *Newcomb*, 22 N. Y. 249; *Hopt* v. *Utah*, 110
U. S. 574; *M. Nat. Bank* v. *Shinn*, 163 N. Y. 360.) The
relator, having received the certificate required by the contract,
was entitled to a peremptory mandamus directing the delivery
of a warrant by the comptroller and the payment of his claim.
(*Matter of Freel*, 148 N. Y. 165; *People ex rel.* v. *Mayor*,
*etc.*, 144 N. Y. 63; *People ex rel.* v. *Coler*, 34 App. Div. 167;
*People ex rel.* v. *Board of Aldermen*, 18 Misc. Rep. 533;
*Matter of Sheehan* v. *Long Island City*, 11 Misc. Rep. 487;
*People ex rel.* v. *Coler*, 26 Misc. Rep. 509; *People ex rel.* v.
*Board of Education*, 158 N. Y. 125; *People ex rel.* v. *Van
Wyck*, 157 N. Y. 495.)

O'BRIEN, J.    There is no dispute with respect to the facts
upon which this controversy depends.    They are all admitted
upon the record and the appeal involves only questions of
law.    On the fifth day of February, 1900, the relator entered
into a written contract with the proper administrative officer
of the city of New York whereby he undertook to regulate
and grade a street.    The law required that the work should
be done by contract.    It was a local improvement, the expense
of which was ultimately to be charged to and paid by the
local property owners.    The city was the authority or agency
to inaugurate the work, but since it was for the benefit in
whole or in part of private property the owners or their prop-
erty became liable ultimately for the cost.    That the relator
actually performed the work embraced in the contract is not
denied or disputed.    The certificate of the officer in charge of
the street was, by the terms of the contract, to be the evidence
of performance, and that certificate was given and filed with
the defendant, as comptroller, showing that the contract price
stipulated to be paid had been earned, and the only ground

8          People ex rel. Rodgers *v.* Coler.          [Feb.,

Opinion of the Court, per O'Brien, J.          [Vol. 166.

upon which the defendant has based his refusal to pay is that the relator has not kept a certain stipulation in the contract, which has no relation whatever to the actual performance of the work, but to matters entirely extraneous. In other words, the comptroller asserts that, while the relator has actually performed the work and earned the compensation under the contract, he has forfeited the right to demand payment, since he has not observed the terms of the Labor Law. He contends that it is not enough that the relator has performed the work, according to the specifications of the contract, unless he performed it by the very means and agencies therein stipulated; that the means and agencies prescribed by the contract were not mere matters of form but matters of substance. The duty enjoined upon the comptroller, the performance of which is commanded by the writ, was ministerial, and if the relator was not entitled to the writ absolutely and as matter of legal right, the court below had power to grant it in the exercise of discretion, and having granted it, the action of the court in that respect is not reviewable here. (*People ex rel. Steinson* v. *Board of Education,* 158 N. Y. 125; *People ex rel. Jacobus* v. *Van Wyck,* 157 N. Y. 495.) The court below had power to grant the writ, and having the power, it is of no consequence, even if it be true as alleged, that the reasons given for its action are untenable.

It must be admitted that the attitude of the city authorities in this respect presents a curious and anomalous situation which involves some startling results. If they are right in the position taken, it must follow that the city must accept and receive the benefit of the improvements made by contractors to the extent of thousands or millions of dollars, and though conceding that the work is honestly done, precisely according to the specifications of the contract, yet it may refuse to pay if it is able to show that the contractor has not, in the execution of the contract, paid to all the workmen employed by him what is called the prevailing rate of wages. The city may accept the work and the citizens may enjoy the benefit of it and treat the contract price as something for-

1901.]     People ex rel. Rodgers *v.* Coler.          9

N. Y. Rep.]     Opinion of the Court, per O'Brien, J.

feited by the contractors for their benefit.   It is obvious that
the reasoning and argument that leads to such a result must
be at some point inherently faulty.   It is not possible that
such injustice can be sanctioned by the courts of any state
where the principles of the common law are recognized.   The
fact that certain provisions of the Labor Law were actually
incorporated into the contract signed by the contractor cannot
change or add anything to the strength of the position
assumed by the city.   The relator is not estopped by the
agreement when there is no element of estoppel in the
case, and the question is with respect to the validity of
the statute and not the construction or effect of the
contract in that regard.   If the law is valid it governs
the contract and the rights of the parties whether actually
incorporated into the writing or not, since all contracts are
assumed to be made with a view to existing laws on the sub-
ject.   If it is not valid the contractor has not made it so
by stipulating in writing to obey it and prescribing the penalty
for his own disobedience which is the forfeiture of all rights
under the agreement.   It is not in the power of the legisla-
ture to protect an invalid law from judicial scrutiny by pro-
viding that it must receive the assent of the parties to every
contract to which it relates.   The argument that the relator is
bound by his voluntary assent to the terms of the contract
would apply with equal force to the city and estop it from
raising the question now before us, since by the certificate of
its own officers that the amount claimed is justly due to the
relator, according to the terms of the contract, the question of
performance is deemed to be settled.   The parties stipulated
that this certificate should be final and conclusive, and it is not
impeached for fraud or invalidity.   Courts in such cases are
not bound by mere forms, but must look at the substance of
things, and so viewing this transaction it would be idle to
attempt to deceive ourselves with the idea that the question
involved in this appeal arises out of the stipulations of the
parties to the contract or is governed by them, rather than the
provisions of a statute.   The contract is in the form that we

2

find it, not because the parties so elected to contract, but for the reason that the statute would not permit them to contract in any other way.

Nor is it entirely true that the statute is a mere direction by the sovereign authority to one of its own agencies to contract in certain cases in a particular way. It is all that no doubt and very much more, since it affects personal and municipal rights in many directions that are of vastly more importance than the mere form of a contract to perform municipal work. It is true enough that a city is an agency of the state to discharge some of the functions of government, but these terms do not adequately describe its true relations to the state or the people.

A municipal officer directing a local improvement is not the agent of the state. He is the agent of the city and the city alone is responsible for his negligence or misconduct. If the authorities in charge of the streets of a city are agents of the state, the city ought not to be held liable for their acts or omissions. The city of New York exists under charters and laws as old as the state itself, and while the legislature is clothed with extensive powers with respect to the administration of local government, there are some things beyond its power. The legislature cannot authorize or compel a city to give any of its money or property, or to loan its credit for any private purpose, nor to expend any of its money, directly or indirectly, for any other than city purposes. If the legislature should by statute require a city to enter into contracts which directly or indirectly secure benefits to private individuals, or particular classes of citizens, and not for purely city purposes, the statute would be void as in conflict with the spirit, if not the letter, of the Constitution. All expenditures of money must be for city purposes and that alone, except so far as it is authorized to devote funds to the relief of the poor or to charity, which may be said to be a city purpose in the largest sense. A statute which tends to divert the money or property of the city, or that of the local property owners, from strictly city purposes and devotes it

directly or indirectly to private interests, or to the interests of some class of persons as distinguished from the whole body, whether the transaction is made to assume the form of payments of wages or something else, is in conflict with the spirit and policy of these provisions of the Constitution. (*People ex rel. D., W. & P. R. R. Co.* v. *Batchellor*, 53 N. Y. 128 ; *People ex rel. Bolton* v. *Albertson*, 55 N. Y. 50.) The legislature does not possess unrestricted power to bind a city hand and foot with respect to all its local business affairs. It cannot fix by statute the price which it must pay for materials or property that it may need, or the compensation that it must pay for labor or other services that it may be obliged to employ, at least when such regulations increase the cost beyond that which it would be obliged to pay in the ordinary course of business. If it could do all these things it could virtually dispose of all the revenues of the city for such purposes as it thought best, and local self-government would be nothing but a sham and a delusion. The constitutional restrictions upon cities with respect to the expenditure of money are of no avail if the legislature can by mandatory laws compel the officers or the governing body to frame contracts in the interest or for the benefit of individuals or classes.

The city is a corporation possessing all the powers of corporations generally and cannot be deprived of its property without its consent or due process of law any more than a private corporation can, and since its revenues must be used for municipal purposes, it is difficult to see how the legislature can make contracts for it which involve the expenditure of these revenues without its consent. Counsel upon both sides of this controversy assert, and it seems to be undisputed, that there are now pending against the city in consequence of alleged violations of the statute in question, claims aggregating over six million dollars, representing the difference in the amount actually paid by the city to its employees, and accepted by them under contracts voluntarily made, and what is assumed to be the prevailing rate of wages under the statute. If it be

assumed that the statute requires the city to pay this vast sum
in addition to what it paid under its contract with these
employees, and which the latter freely accepted, it would be
very difficult, if not impossible, to show that such payment is
for a city purpose, and thus the municipality is compelled by
the statute to violate the Constitution. This situation would
seem to prove that either the statute or the Constitution must
be disregarded. To the extent of the sum which the city pays
under this statute in excess of that which it actually paid for
the work under contracts fairly made in the ordinary course of
business, the provision of the Constitution limiting expendi-
tures of money to city purposes is violated. These limitations
upon the payment of money by cities apply as well to the
power of the legislature. What the city is by the Constitu-
tion forbidden to do, it is not competent for the legislature to
authorize or command, either directly or indirectly, and the
vice of the statute in question is to be found in the fact that
it provides or may provide for a gratuity to some one, or per-
haps more properly to some class of citizens.

The city exists under its ancient charters as modified or
enlarged by modern enactments for the purpose of local self-
government. While the rights and powers so conferred upon
the city are subject to change or modification by the supreme
power of the state they cannot be wholly destroyed. It is
not true that the internal affairs of cities in this state are
absolutely subject to the will of the legislature. The Consti-
tution recognizes their existence as political and corporate
bodies and has imposed various restrictions upon the powers
of the legislature to interfere in matters of local government.
It is without power to appoint city officers, though it may pro-
vide for their election by the local electors, or their appoint-
ment by some local authority. It cannot dispose of the prop-
erty of the municipality, nor disburse its revenues, however
acquired, for any purpose not pertaining to local administra-
tion or local government.

The recent amendment to the Constitution, which confers
upon the mayor in the larger cities and the mayor and govern-

ing body in the others the right to interpose what may be called a qualified veto upon acts of the state legislature relating to their local affairs, plainly implies that cities possess a certain kind of political autonomy which, however limited, the legislature may not invade or destroy at pleasure. (1 Dillon on Munic. Corp. §§ 71–74.) It may regulate but cannot destroy powers recognized by the Constitution as inherent in the cities of the state. The plain purpose and effect of the law in question was to deprive the city and its contractors of the exercise of all judgment and discretion in the matter of wages to be paid to workmen employed upon all public works. Both the city and the contractor are deprived by the statute of all power to deal with that question, and, consequently, of all power to protect most vital interests in that regard by contract or otherwise. The right which is conceded to every private individual and every private corporation in the state to make their own contracts and their own bargains is denied to cities and to contractors for city work ; and, moreover, if the latter attempt to assert such right the money earned on the contract is declared to be forfeited to the city without the intervention of any legal process or judicial decree. The exercise of such a power is inconsistent with the principles of civil liberty, the preservation and enforcement of which was the main purpose in view when the Constitution was enacted. If the legislature has power to deprive cities and their contractors of the right to agree with their workmen upon rates of compensation, why has it not the same power with respect to all private persons and all private corporations? That question can be answered in the language which this court used when a case with features somewhat similar was under consideration : " Such legislation may invade one class of rights to-day and another to-morrow, and if it can be sanctioned under the Constitution, while far removed in time we will not be far away in practical statesmanship from those ages when governmental prefects supervised the building of houses, the rearing of cattle, the sowing of seed and the reaping of grain, and governmental ordinances regulated

the movements and labor of artisans, the rate of wages, the price of food, the diet and clothing of the people, and a large range of other affairs long since in all civilized lands regarded as outside of governmental functions." (*In re Jacobs*, 98 N. Y. 98.) It was once a political maxim that the government governs best which governs the least. It is possible that we have now outgrown it, but it was an idea that was always present to the minds of the men who framed the Constitution, and it is proper for courts to bear it in mind when expounding that instrument. The power to deprive master and servant of the right to agree upon the rate of wages which the latter was to receive is one of the things which can be regarded as impliedly prohibited by the fundamental law upon consideration of its whole scope and purpose as well as the restrictions and guaranties expressed. If the city is not permitted to enter into fair contracts with its employees for their services, on such terms as private individuals or private corporations may, it is disabled from performing the duties enjoined upon it by law or from obeying the restrictions of the Constitution. Even the ordinary employees in the civil service of the city are protected by the Constitution from the exercise of absolute power by the legislature. Appointments and promotions in such service must be made with reference to merit and fitness to be ascertained when practicable by competitive examinations. The legislature has no power to enact permissive or mandatory laws in conflict with that principle. These illustrations, and others which might be given, prove that the proposition that cities and their internal affairs are subjected to the absolute will of the legislature, and that it has the power to command the municipality to do this or that as it may think best is very far from correct. There are many express limitations upon its power and others are to be implied from the very nature of the right of local self-government conferred by the fundamental law. The legislature cannot appoint an officer to make the contracts of a city, and what it cannot do through its own appointee it cannot do by direct action. In this case the legislature made the contract

for the city at least so far as it relates to the employment of workmen and their wages. The prevailing rate of wages must be from its very nature a question of fact, governed by conditions and circumstances over which the contractor has no control. The legislature cannot compel him to decide that question at his peril by depriving him of the right to set it at rest by agreement with his employees.

But the statute also invades private rights in various other directions. The local property owners, who are the parties that in the end must bear the expense of the improvement, are entitled to the benefit of the best judgment and discretion of the city officers in making the contract for the work. To the extent that such judgment and discretion is taken away by arbitrary enactments not in their interest, but in favor of opposing interests, their constitutional rights of liberty and property are invaded. When the expense of the improvement is enlarged beyond actual and reasonable cost, under ordinary business conditions, as it may be under the statute in question, their property is taken without due process of law. (The contractor is a private individual engaged in private business. When he enters into a fair and honest contract for some municipal improvement, that contract is property entitled to the same protection as any other property. It is not competent for the legislature to deprive him of the benefit of this contract by imposing burdensome conditions with respect to the means of performance, or to regulate the rate of wages which he shall pay to his workmen, or to withhold the contract price when such conditions are not complied with in the judgment of the city. When he is not left free to select his own workmen upon such terms as he and they can fairly agree upon, he is deprived of that liberty of action and right to accumulate property embraced within the guaranties of the Constitution, since his right to the free use of all his faculties in the pursuit of an honest vocation is so far abridged.) A statute which enables a city that has entered into a contract with him for the performance of some public work to receive and accept

16        People ex rel. Rodgers *v.* Coler.        [Feb.,

Opinion of the Court, per O'Brien, J.        [Vol. 166.

the fruits of his labor and at the same time refuse to pay for it upon the ground that he omitted to pay the prevailing rate of wages to his workmen, though he paid all they asked and all he agreed to pay, would seem to be an arbitrary interference with his liberty and property, and not within the legitimate sphere of legislation. It is not claimed that the statute has any relation to the public health, the public morals, the public safety, or any of the other objects within the scope of the police power, and it is a somewhat remarkable fact that the learned counsel, who has argued in support of this appeal and of this statute, has not attempted to state the purpose for which it was enacted, but leaves that point wholly to conjecture.

It is impossible to see how such legislation could promote the true interests of the city or that of the local taxpayer, and not difficult to see how in its actual operation it would tend to increase the cost of every local improvement. Indeed, it is conceded on all sides that such has been the effect of the law upon the expense of public improvements in the city of New York. The very ground upon which the city refused to pay was that the contractor did not pay enough for the labor performed. If the claims referred to, aggregating over six millions of dollars, must be paid, then it is plain that this law will cost the city that sum without any additional or corresponding benefit. The funds necessary to pay these claims would involve the expenditure of money for other than city purposes. It was supposed, no doubt, that the law would benefit wage earners, but it is not clear how it can if we consider that class of citizens as a body. A law that restricts freedom of contract on the part of both the master and servant cannot in the end operate to the benefit of either. The law forbids the contractor from paying a rate of wages other than what is called the prevailing rate although the laborer is willing to accept it. It calls for the payment, practically, on all occasions of the highest market price, and, hence, must compel the contractor to employ only such workmen as are competent to earn the very highest rate of compensation. It makes no allowance for the various degrees of efficiency and capacity

that must always exist in so large a part of the community. A person less competent than his neighbor from whatever cause cannot be employed because a uniform rate must be paid without taking into account the varying conditions of life and the degrees of capacity. Such a law may indeed benefit for a time the favored few who possess the largest capacity to earn the largest wages, and in this view it may be said that it provides only for the survival of the fittest. But the effect of the law must be that all those who are too young or too old, or for any other reason less competent than their neighbors, must be deprived of all opportunity to secure employment on all public works in their respective callings, and so the tendency of such legislation is to check individual exertion and to suppress industrial freedom. The contractor is not only deprived of the right to make such contracts with his workmen as would be mutually acceptable and beneficial, but he is required in selecting his employees to give preference to citizens of this state. Citizens of other states and resident aliens are thus subjected to harsh discrimination. The citizens of each state are entitled to all privileges and immunities of citizens in the several states under the Federal Constitution, and persons still unnaturalized are protected by the broad principles of international law. It is not necessary to inquire how far, if at all, the rights of citizens of other states seeking employment here, or those of aliens who have come here to improve their condition and to earn an honest living, are ignored or restricted by this statute. These questions have not been raised or argued, and we will only remark that it reverses the settled policy of this state from the earliest times. The policy of New York has always been to welcome not only the citizens of our sister states, but emigrants from abroad to equal participation in all the opportunities and advantages of its business and industrial life. If the policy indicated in the statute now under consideration had been formulated and carried into operation half a century earlier, it may be that the growth and progress of the state would not be the subject of so much pride or as gratifying to all the people as it is

now. These conclusions result from principles that have been often stated by this court when paternal legislation of the same character was under consideration. (*In re Jacobs*, 98 N. Y. 98; *People* v. *Marx*, 99 N. Y. 378; *People* v. *Gillson*, 109 N. Y. 389; *Colon* v. *Lisk*, 153 N. Y. 188; *People* v. *Hawkins*, 157 N. Y. 1; *People ex rel. Tyroler* v. *Warden, etc.*, 157 N. Y. 116.) Numerous other cases might be cited from other jurisdictions that tend to support the views expressed. They are referred to and quoted in the briefs of counsel and it is unnecessary to comment upon them generally.

These cases, however, deal with a great variety of statutes in line with the one involved in the case at bar. They constitute a valuable contribution to the law with respect to the scope and limits of legislative power. In all of them statutes differing in no essential principle from that now under consideration were held void as in conflict with constitutional restrictions, express or implied. The prominent feature in the discussions is that the legislation is condemned as an infringement upon the right of employer and employee to enter into contracts in their own way, and in some of them it was said that such legislation was an insulting attempt to put the laborer under legislative tutelage which was not only degrading to his manhood, but subversive of his rights as a citizen. The statutes considered all profess to be for the purpose of securing to the wage earner his rights, but it was shown that they were really subversive of them. The following are a few of the laws thus considered and condemned, and it will be seen that they were all in line with the enactment in question: An act forbidding employers from withholding wages from employees engaged in weaving for imperfections in the work. (*Com.* v. *Perry*, 155 Mass. 117.) An act to secure operators in coal mines and certain manufactories the payment of their wages at regular intervals and in lawful money. (*Godcharles* v. *Wigeman*, 113 Pa. St. 431; *State* v. *Goodwill*, 33 W. Va. 179; *State* v. *Fire Creek C. & C. Co.*, Id. 188.) An act relating to the payment of wages to miners employed upon the basis of the quantity of coal mined. (*Ramsey* v.

*People*, 142 Ill. 380.) An act to provide for payment of wages in money and prohibit the system of truck stores and to prevent deductions from wages except for money advanced. (*Frorer* v. *People*, 141 Ill. 171.) An act to provide for weekly payment of wages by corporations. (147 Ill. 66.) An act declaring it unlawful for persons engaged in mining to pay wages otherwise than in money. (*State* v. *Loomis*, 115 Mo. 307.) A city ordinance enacting that laborers should receive not less than $1.50 per day, and that the day should not exceed eight hours. (*State ex rel. Bramley* v. *Norton*, 5 Ohio N. P. R. 183.) The case last cited is not distinguishable from the one at bar. Indeed, it involves the very question, and while it is not a decision of the highest court of the state, it is based upon the authority and the doctrines of the other cases cited and upon reasoning that seems to be unanswerable. The case at bar differs from these cases, cited from the highest courts of other states, only in the circumstance that here the legislature has made use of municipal corporations to accomplish the purposes which were there condemned. But it must be obvious that what the legislature cannot do directly it cannot do indirectly. It cannot make use of its powers over municipal corporations to subvert rights of liberty and property guaranteed by the Constitution.

The compulsory authority of the legislature over municipal corporations in regard to matters of general concern and duties which the people of the several localities owe to the state at large is not questioned. Legislative control in matters political and governmental is complete. But while such corporations are made use of in state governments, and in that character subject to state control, they have other objects and purposes peculiarly local, in which the state at large, except in conferring the power and regulating its exercise, is legally no more concerned than it is in the individual and private concerns of its several citizens, and it is from the standpoint not of state interest but of local interest that the necessity of incorporating cities and villages most distinctly appears. With respect to property and contract rights of

exclusively local concern, the state has no right to interfere and control by compulsory legislation the action of municipal corporations. The people of the state at large, through their representatives, have no more authority to dictate to a city the form in which its contracts shall be framed or the wages that it shall pay to laborers than they have to dictate to an individual what he shall eat, drink or wear. A municipal corporation, in matters affecting its property and its private contract rights, enjoys practically the same immunity from legislative interference for the benefit of private corporations or individuals as is accorded to business corporations and private citizens. (*People ex rel. Park Comrs.* v. *Detroit*, 28 Mich. 228; *Loan Assn.* v. *Topeka*, 87 U. S. [20 Wall.] 655; *People ex rel. D., W. & P. R. R. Co.* v. *Batchellor, supra;* *Weismer* v. *Village of Douglas*, 64 N. Y. 91; *Board of Education* v. *Blodgett*, 155 Ill. 441.)

The case of *Clark* v. *State* (142 N. Y. 101), cited by the learned corporation counsel, is not in conflict with the views herein expressed. All that this case decided was that the state had power to declare by statute the compensation to be paid to its own employees in the absence of any agreement providing for a different rate. But the right to make contracts for the compensation to be paid, whether greater or less than the statutory rate, is expressly recognized and conceded throughout the opinion, and it is obvious that under the Constitution that right could not be abrogated, since the power to employ labor is conferred by that instrument upon the superintendent of public works. The power to employ implies the power to agree upon the compensation, and while the statute was applied to cases where no such agreement was made, it could not deprive the superintendent of the power conferred upon him by the Constitution. (*People ex rel. Killeen* v. *Angle*, 109 N. Y. 564.) The statute which was under consideration in that case did not attempt to interfere with the right to make contracts.

In the brief time that we have been able to devote to an examination of this case, it would not be practicable to con-

sider all the special features of the law and to determine the parts that are good and those that are objectionable. It will be sufficient for all purposes of this case to say that, in so far as the statute is invoked to shield the city from the obligation to pay the relator the money due to him, it is not a valid defense, for the reason that some of its most material provisions are in conflict with the Constitution.

1. Because in its actual operation it permits and requires the expenditure of the money of the city or that of the local property owner for other than city purposes.

2. Because it invades rights of liberty and property in that it denies to the city and the contractor the right to agree with their employees upon the measure of their compensation, and compels them in all cases to pay an arbitrary and uniform rate which is expressed in vague language, difficult to define or ascertain and subject to constant change from artificial causes.

3. Because it virtually confiscates all property rights of the contractor under his contract for breach of his engagement to obey the statute, and it attempts to make acts and omissions penal, which, in themselves, are innocent and harmless. It, in effect, imposes a penalty upon the exercise by the city or by the contractor of the right to agree with their employees upon the terms and conditions of the employment.

We have already seen that it is no answer to the relator's claim to be paid what is justly due to him to say that he has consented in the contract that it should be forfeited to the city in the event of a violation of the Labor Law. The question does not originate in any agreement voluntarily made, but arises out of the statute, and the validity or invalidity of that enactment is the fundamental question. Neither the city nor the contractor had any interest in these stipulations. They are in the contract only by force of the mandate of the statute, and, unless the legislature had power to frame the contract in that respect, their presence is of no consequence. The city could not maintain any action for damages for violation of these stipulations by the contractor, for the plain reason that it was impossible for it to sustain any damages under the cir-

22          People ex rel. Rodgers v. Coler.          [Feb.,

Opinion per Landon, J.          [Vol. 166.

cumstances. Those provisions are a part of the contract in form only, since they lack the one most essential element of every contract, namely, the consent of the parties. The obligations and legal effect of a promise or engagement imported into a contract by force of a statute, as in this case, whereby the contracting parties agree to obey or execute some law, depend entirely upon the validity of the law. Every person is bound to obey the law irrespective of any express agreement on his part to that effect, but he does not incur any liability or penalty for breach of an agreement to obey a void law. Such a promise or agreement cannot survive the statute upon which it is founded, but must fall with it, since it can have no independent existence arising from the consent of the parties or the meeting of minds. No one would claim that the terms of the contract precluded the relator from the recovery of what is due to him for the work but for the law which is behind it. The effect of this statute was to make the city a trustee or instrument for the enforcement of the law in the interests of the persons for whose benefit it was enacted, and thus the powers and functions of the municipality are employed for purposes foreign to those for which they were created and exist under the Constitution.

The order of the Appellate Division should be affirmed, with costs.

Landon, J. I concur in the opinion of Judge O'Brien. I think it proper to state some considerations which I suppose to be pertinent:

1. The city has a governmental capacity, and the business capacity incidental to it. Its governmental capacity does not extend to the wages private persons shall pay their servants, and hence it cannot in its business capacity fix such wages.

2. The relator, in taking care of his part of the contract, is exclusively engaged in minding his private business. The city cannot interfere with him except upon his failure to render proper performance of the work or of some connected requirement affecting the public convenience or safety.

Hence he is an independent contractor, and thus free to hire his own workmen as any other person may.

3. In its business contracts with a person, the state or city is on one side of the contract and the person on the other. Each should render to the other the promised equivalent. Here the contractor has rendered to the city all the equivalent that it has capacity to receive. It cannot ask for more in behalf of itself, but it assumes a grievance in behalf of others, of whom it is neither guardian nor trustee. They are free men. It will be timely to hear them when they ask a hearing. The city thus asks for more than the equivalent promised to it. The vice of its position is that it seeks to thrust into a business contract, in addition to its subject-matter, control over the contractor's independent relations with other people. It does not hire his servants, and, therefore, cannot fix their wages.

4. The state, like an individual, may contract for the kind and quality of materials to be furnished in a given construction; otherwise it may not get what it wants. It is, I submit, false analogy to assume that it has the like right to dictate to the contractor the wages he shall pay his workmen. They are not parties to the contract; it is not made for their benefit; the state cannot directly give them gratuities, and, therefore, cannot indirectly do so through the contractor; much less by extortion masked under the power to contract. Conceding that the state has a benevolent sentiment of concern in the matter of workmen's wages, that sentiment has no relation to the subject-matter the contractor has agreed to deliver; and because it has none, the contrary claim of the state has no just basis. The contract calls for a certain kind of work by Rodgers the relator. If he furnished it, it is of no more business concern to the state than to the individual whether he has meantime furnished his workmen with tooth brushes or paid them extra wages.

5. An officer is a part of the personal force by which the state acts, thinks, determines, administers and makes its Constitution and laws operative and effective. He is an arm of

the state and always on its side. The contractor, laborer or employee deals at arm's length with the state, and is always on his own side, not necessarily opposed to the state, but with respect to his service owing it no oath-bound duty, but simply the contractual duty to perform as he has agreed to do. The state can fix the salaries it will pay its officers, but no more than the individual can fix the wages it will pay employees; it can fix the wages it will offer — and its policy is to fix them high enough to secure acceptance by the workmen — but without such acceptance the wages cannot be fixed. They must remain a matter of contract; the power to fix the rate, as distinguished from offering it, includes a low rate as well as a high one, and thus becomes despotic in substance, however dormant in exercise.

6. When an independent contractor with the state or city has performed his work on time, complete in every detail according to the contract, free from every lien and incumbrance, then, if the state or city can escape paying him because he has not voted a certain ticket, made contribution to a certain political party, or paid his workmen any more than they agreed to work for, the state can compel him to choose between losing his earnings or his natural liberty to make such honest contracts with his fellow-men for their services as they are willing to make with him. To deny an independent contractor such liberty and protect others in it, is to deny him the equal protection of the laws.

7. To enact that no less than the prevailing rate of wages shall be paid by such contractor is an indirect method of excluding from his employment those who can earn something, but not so much, since he will not hire those who cannot do the work of an able-bodied man.

8. It is admitted that the contractor paid less than the prevailing rate of wages. No doubt that is true if the highest rate among the best workmen is the test. But what is the prevailing rate of wages? Is it the rate that the best workmen or the largest mass of workmen, or the average workmen, can command? Does it depend upon ability? If so, of which

grade? Or upon numbers? If so, is it the majority of all or of a class? And if of a class, of which class, and why? What rights have those who do not come within the dominant class? Does it depend upon supply and demand? Upon fair competition? How can we tell? Must we not conclude that a statute which simply says the prevailing rate of wages is too indefinite in its meaning to be made the test or condition of a penalty or forfeiture? When a penal statute leaves doubtful the kind of act it denounces the accused is entitled to the benefit of the doubt, and though he may not insist upon the doubt the state out of self-respect should refrain from inflicting the penalty.

PARKER, Ch. J. (dissenting). The reasoning by which the decision about to be made is sought to be supported fails to persuade me that it is other than a judicial encroachment upon legislative prerogative; for it is that and nothing less if the statute does not offend against either the Federal or the State Constitution. If the statute, which seems to be regarded by some as vicious in its tendency, attempted to regulate the question of wages as between citizens of the state so as to affect even in the slightest degree the basis on which one citizen should contract with another, then not only would much of the discussion which this statute has invoked be relevant, but the decision about to be made would be unquestionably sound. The legislature, however, intended nothing of the kind, and the statute not only omits to express any such purpose, but it is so carefully guarded as to leave no room for doubt that the legislature, appreciating the limits of its authority, intended to and did simply provide with certainty that those who work directly for the state or upon public works within the state, shall receive that which may be termed going wages in the locality in which any particular public work is being carried on as will at once appear from a reading of the statute, so much of which as is germane to the question under discussion being set out in the statement of facts. In other words, the legislature, which is vested with the power to direct the conduct of the business

26      People ex rel. Rodgers *v.* Coler.      [Feb.,

Dissenting opinion, per Parker, Ch. J.      [Vol. 166.

operations of the state, by this statute has not only declared it to be the policy of the state as a proprietor to pay the prevailing rate of wages, but has enjoined upon its several agents and agencies the duty of executing this policy. An attack upon this statute, therefore, assails the right of the state as a proprietor to pay such wages as it chooses to those who either work for it directly, or upon any work of construction in which it may be engaged.

No one has presumed to challenge the right of an individual either to pay the prevailing rate of wages in his locality, or, if he concludes to have his work done by contract, to refuse to award it to a contractor who will not agree to pay the going wages to all employees that may be engaged upon the work. But the state seems to be regarded in some quarters as having less power as a proprietor than an individual, so that what an individual may contract to do in the performance of his own work, the state itself may not do when it assumes the role of proprietor and attempts the construction of important public work.

Now, having called attention to the fact that the statute by its terms is expressly limited to laborers employed upon the work of which the state, in its entirety or through some subdivision thereof, is the proprietor, we come to the question whether there is any provision of either the Federal or State Constitution that so far restricts the power of the state in constructing its buildings or other public works, that it has less liberty of action than one of its citizens. That it has, to say the least, as much power as a proprietor as has any of the individuals of which its citizenship is comprised, would seem to be a self-evident proposition. But as evidence is not wanting that it is not so regarded by others the subject must have some consideration. In 1889 the legislature provided by statute that from and after the passage of the act the wages of day laborers employed by the state, or any officer thereof, should not be less than two dollars per day. (Chapter 380 of the Laws of 1889.) It is difficult to imagine from what source the idea could have been born

that this statute was unconstitutional, in view of the fact that it was known of all men that the legislature had always fixed the compensation of its executive, legislative and judicial officers, and had provided from the beginning what compensation, if any, should be paid to all of the county and city officers throughout the state. Indeed, the compensation for every kind and character of service whatsoever had always been fixed either by the legislature directly, or through agencies created by it, the original source of power in all cases being the legislature. Nevertheless, there were those who conceived the absurd idea that there was some distinction between the compensation for day laborers and the compensation for all others engaged in the service of the state, and so the demand of one Clark, who was employed upon the canals, for the compensation fixed by the legislature, was challenged and finally came to this court, where the question was put at rest by a unanimous decision, which held that "There is no express or implied restriction to be found in the Constitution upon the power of the legislature to fix and declare the rate of compensation to be paid for labor or services performed upon the public works of the state. That legislation is doubtless open to criticism from the standpoint of sound policy and expediency, but the courts have nothing to do with these questions so long as it is not in conflict with the Constitution, and we think that a general law regulating the compensation of laborers employed by the state or by officers under its authority, which disturbs no vested right or contract, was within the power of the legislature to enact, whatever may be said as to its wisdom or policy." (*Clark* v. *State of N. Y.*, 142 N. Y. 101.)

Now, certainly it need not be argued that, if the Constitution contains no restriction "upon the power of the legislature to fix and declare the rate of compensation to be paid for labor or services performed on the public works of the state," there is nothing in the Constitution to restrict the power of the legislature in declaring that "the rate of compensation to be paid for labor or service performed on the public works of

the state " " shall (in the language of the statute) not be less
than the prevailing rate for a day's work in the same trade or
occupation in the locality within the state where such public
work on, about or in connection with which labor is per-
formed, in its final or completed form is to be situated,
erected or used." So, if authority be needed, we have the
authority of this court that the legislature has the power
to provide that the policy of the state shall be to pay
the going rate of wages in the locality in which a public
work is to be done and to command its agents to obey its
directions in that regard. For illustration: Were it now
engaged in the erection of a new capitol, the public officer or
officers having in charge the construction by appointment of
the legislature, would, under the authority of the *Clark* case,
be obliged to pay the prevailing rate of wages in Albany,
and if, in the course of construction, it should be determined
to do some part of the work by contract, as was the case
during the last year of work upon the capitol, those having in
charge the construction would be obliged to provide in the
contract that the contractor should pay the prevailing rate of
wages in Albany. Of course, a contractor would not be.
obliged to accept a contract under such terms; but certainly
would do so if he wished the work, for the state as proprietor
would have the right to impose any terms it might choose as
a condition of awarding the contract, just as an individual
might do. Terms might thus be imposed which would be wise
or very foolish for both the state and the contractor, in the
estimation of the latter; but it is the proprietor's right to be
unwise if he so wills, in which respect the state is perhaps
both in theory and practice on an equality with its citizens.
The provision in the contract requiring, in effect, that he
should pay the going wages would, of course, interfere with
his liberty to hire men for lower wages. So a provision that
he must use a certain brand of cement which is no better and
costs more than other brands would interfere with his liberty
to buy first class cement at a lower price than the brand named.
A provision that some or all of the figure work cut out of

1901.]        People ex rel. Rodgers v. Coler.        **29**

N. Y. Rep.]     Dissenting opinion, per Parker, Ch. J.

stone should be done by workmen from Italy, would perhaps interfere with the employment at less expense of men of equal or greater skill at home who could do equally good or better work, and to that extent his liberty to so contract as to make a greater profit for himself, without injury to the proprietor, would be interfered with; but it is interfered with only because he assents to the proprietor's wishes and contracts that it shall be so, and hence his liberty is not interfered with at all within the meaning of the Constitution; for he has solemnly covenanted in his agreement that he shall not be at liberty to do anything in the course of the performance of the contract that shall be contrary to the wishes of the proprietor as expressed in the written contract.

I have yet to hear an argument from any quarter offered for the purpose of showing that the state as a proprietor could not in the erection, for instance, of a new capitol, fix the wages to be paid by its contractors, provide that its sculptors should come from Italy, its decorators from Paris, its stone from specific quarries in Massachusetts and its cement from England, when perhaps better results could be obtained should only residents of this state be employed and the material purchased within its own borders. But it is said that this statute goes further and applies not only to the work undertaken by the state at large, but also to the public works carried on in the several municipalities of the state, the particular case before the court growing out of a contract made between the city of New York and the relator, by which the latter agreed to regulate and grade West 135th street in that city from Amsterdam avenue to the Boulevard. The authority of the state, however, is supreme in every part of it and in all of the public undertakings the state is the proprietor. For convenience of local administration the state has been divided into municipalities, in each of which there may be found local officers exercising a certain measure of authority, but in that which they do they are but the agents of the state, without power to do a single act beyond the boundary set by the state acting through its legislature.

Charters are given to cities by means of which are created what are known as municipal corporations; but the creation. is solely for the purpose of doing the work of the state in the particular locality affected, and in the creation of these agencies the legislature designates the number of officers, determines what they shall be called, prescribes what particular portion of the municipal work each shall do, fixes their compensation and provides a method by which shall be chosen a proper amount of assistance, clerical and otherwise, to perform the work, and from time to time enlarges or restricts the fields of labor of the several officers; it also from time to time by special enactment authorizes undertakings of large public importance, not contemplated perhaps at the time of the granting of the charter or at the time of a general revision of it. If the legislature becomes dissatisfied with the general working of a charter it may change it or create a new one, for it is possessed of supreme authority to provide the method by which the municipal affairs shall be conducted and to determine what great public works, if any, shall be undertaken. If it shall determine that the city is in need of a large supply of pure and wholesome water, the legislature, and the legislature alone, may provide the machinery by which that result may be accomplished. In the doing of it the legislature may devolve the administration of the details of the work upon the local municipal officers already in existence, or it may select another agency without even consulting the wishes of either the taxpayers or the voters of a city, as was the case in the building of the new aqueduct, which was authorized by chapter 490 of the Laws of 1883. The act was entitled "An act to provide new reservoirs, dams and a new aqueduct, with the appurtenances thereto, for the purpose of supplying the city of New York with an increased supply of pure and wholesome water." It contained full authority for the execution of this vast undertaking, which was expected to and did cost the city of New York very many millions of dollars, under the direction of six commissioners named in

the act, upon whom was devolved both the power and the
duty of effectuating the purpose of the legislature as
expressed in the statute. The Constitution has, of course,
imposed some restrictions upon the legislative power, such,
for instance, as that the legislature shall not authorize the
construction of a street surface railroad without the con-
sent of the local authorities and fifty per cent of the abutting
property owners, or in lieu thereof the consent of the Appel-
late Division of the Supreme Court. But prior to the incor-
poration of such a provision into the Constitution, the legisla-
ture had the power, and until 1850 exercised it, of authorizing
the construction of street surface railroads without the consent
of either the local authorities or the property owners, as will
appear from an examination of the statutes referred to in
*Ingersoll* v. *Nassau Railroad Company* (157 N. Y. at page
466).

Similar instances almost without number might be multi-
plied, all of which would serve as illustrations merely that the
state acting through its legislature has absolute power and
control over all the public works within the state, undertaken
and carried on with public funds, whether the work be paid
for by a municipality or by the state at large, and that those
who let the contracts, superintend the construction, audit the
bills and pay them, are in such work but the agents of the
state, whether the agency be created by the provisions of a
charter or by special enactment. If authority be needed in
support of this proposition, it may be found in *Williams* v.
*Eggleston* (170 U. S. 304). At page 310 the court says: " A
municipal corporation is, so far as its purely municipal rela-
tions are concerned, simply an agency of the state for conduct-
ing the affairs of government, and as such it is subject to the
control of the legislature."

Authority to the same effect may also be found in cases in
this court of which *Mayor* v. *Tenth National Bank* (111 N.
Y. 446) is a type. In that case the question presented was
whether the city of New York could be compelled by the
legislature to pay to the Tenth National Bank moneys that it

had advanced without authority of law to the county commissioners which were in part misappropriated by them, the balance of the moneys being used in the construction of the court house in New York city. The act of the legislature requiring the city to pay to the bank the moneys advanced by it was upheld in this court, and in the course of the opinion the court said: "Municipal corporations are creatures of the state and exist and act in subordination to its sovereign power. The legislature may determine what moneys they may raise and expend, and what taxation for municipal purposes may be imposed; and it certainly does not exceed its constitutional authority when it compels a municipal corporation to pay a debt which has some meritorious basis to rest on."

Other authorities in which the proposition is in effect either decided or asserted that a municipal corporation is simply an agency of the state for the conduct of the affairs of government, and, therefore, subject to the control of the legislature in all respects except as expressly limited by the Constitution, are : *In re Protestant Episcopal School* (46 N. Y. 178); *Terrett* v. *Taylor* (9 Cranch, 43); *Payne* v. *Treadwell* (16 Cal. 221); *Jones* v. *Town of Lake View* (151 Ill. 663); *Mayor, etc., of Frederick* v. *Groshon* (30 Md. 436); *Groff* v. *Mayor, etc., of Frederick City* (44 Md. 67); *State Bank* v. *Madison* (3 Ind. 43); *City of Paterson* v. *Society for E. U. M.* (24 N. J. L. 385); *State ex rel. Cleveland* v. *Board of Finance, etc.* (38 N. J. L. 259); *In re Dalton* (59 Pac. Rep. 336).

In the latter case the petitioner was arrested for violating the provisions of chapter 114 of the Laws of 1891 of the state of Kansas, which provided that eight hours should constitute a day's work for laborers, workmen, mechanics and other persons employed by or on behalf of the state of Kansas, or by or on behalf of any county, city, township or other municipality in the state. He sought to be relieved from trial through habeas corpus proceedings, claiming that the act was unconstitutional. The court thought that the statute was constitutional, and in the course of the opinion the court said :

"Whatever orders the state may give directly to its own

agents it may require of its political subdivisions, instrumentalities of said government, such as counties, cities, townships. These subdivisions are merely involuntary political or civil divisions of the state, created by statute to aid in the administration of government. 'A county is one of the civil divisions of a country for judicial and political purposes, created by the sovereign power of the state of its own will, without the particular solicitation, consent or concurrent action of the people who inhabit it; a local organization, which for the purpose of civil administration, is invested with certain functions of corporate existence.' It has been held competent for the legislature to establish a state road and cast the cost and expense thereof upon the county in which the road lies without the consent of the officers or people of the county. And, in like manner, it may require the county to build a certain kind or number of bridges at specified places, another county to build roads in a particular locality, and another to build public buildings; and for this and other public purposes the counties and other municipalities could be required to levy a tax, and make other provisions for the payment of such improvements. Indeed, everything relating to the management of counties, cities and townships not defined and limited by the Constitution may be taken away by the state, acting through its legislature; and as to these political divisions and their agents, the legislature has the same power that it possesses over state officers. We conclude, therefore, that the statute under consideration is a mere direction of the state to its agents, and a proper exercise of its power in that respect."

If the views so far expressed be sound, it would seem to follow that the position taken by the state in enacting this statute is precisely like that of an individual who for any reason determines that if it be a little more than honest, as that term is usually employed, it is not more than just to pay for a thing what it is fairly worth, and that the principle should be applied as well to the compensation of labor as to the payment for material, and hence decides that in construction work

he will pay the market price. The state having determined upon such a course of action by this statute, directs its agents and agencies, wherever throughout the state they may be situated, that in the doing of a public work they shall pay the going wages whenever the work is to be done by day's work, and whenever it is to be done by contract, then the agent, wherever situated, shall put into the contract that it executes by authority of the state a provision that the contractor shall pay such rate.

There are no authorities in this state that militate against the position that I have taken. On the contrary, such as there are support it. In *People* v. *Warren* (77 Hun, 120) the defendant had been charged before a police magistrate with a violation of section 504, chapter 105 of the Laws of 1891, entitled "An act to revise the charter of the city of Buffalo." That charter provided, among other things, that "in contracting for any work required to be done by the city, a clause shall be inserted that the contractor submitting proposals shall bind himself in the performance of such work not to discriminate either as to workmen or wages against members of labor organizations, or to accept any more than eight hours as a day's work, to be performed within nine consecutive hours." The defendant having been convicted, an appeal was taken to the General Term, fifth department, where the argument was made that the statute was unconstitutional because offending against the provisions of section 1, article 14 of the Constitution of the United States, and of the provisions of section 1, article 1 of the Constitution of the State of New York. It was held by a unanimous court that the statute was constitutional and the judgment of conviction was affirmed. Subsequently an unsuccessful attempt was made to secure a different result through the instrumentality of a writ of habeas corpus. I take an extract from the opinion, which was written by Judge HATCH, because it is in point on the next proposition that I propose to discuss. "It is said that defendant is an independent contractor and consequently the rules we have invoked have no application to the case. If this were con-

1901.]   .   People ex rel. Rodgers v. Coler.   .   35

N. Y. Rep.]      Dissenting opinion, per Parker, Ch. J.

ceded it might not be possible to answer the claim. But the assertion itself, as I view the facts, is far from being true. In the sense that the defendant is doing work for the city of Buffalo to furnish all material and labor in making a public improvement for a given sum, it is a fact. But that it is relived from the obligations imposed by the state upon the city of Buffalo and assumed by it is not true as matter of law.  *  *  *  The city said to the defendant and to all other contractors when it invited the bids for the performance of the work, the statute is one of the conditions which must be complied with and an obligation which must be assumed by the contracting party. The defendant was not obliged to bid. The conditions imposed applied equally to all who should bid. The act of bidding was with full knowledge and voluntary. Under these conditions defendant made its bid and when awarded the contract voluntarily executed the same and assumed the obligations imposed upon the city by the statute. How can it be said that he was an independent contractor, freed of obligations? He was an independent contractor, but he is not independent of the obligations imposed by the contract." (*People ex rel. Warren* v. *Beck*, 10 Misc. Rep. 77.)

It should also be said before passing to the consideration of the contract that the judge before whom this matter came at Special Term was of the opinion that the act is constitutional, and while there was a difference of view in the Appellate Division as to certain questions, not one of the judges of that court expressed an opinion that the state in so far as it directed its agents to insert a provision in the contract that the prevailing rate of wages should be paid, acted beyond its power. Indeed, in the prevailing opinion it is said : "I am satisfied that the legislature has power to prescribe the form of contracts which shall be made by municipal corporations with those entering into contracts with it. No one is bound to enter into such a contract or to do work for a municipal corporation, but when he does he must accept the terms of the contract as prescribed by law, and if he voluntarily makes a

contract by which he is to receive pay only upon condition of his performing certain obligations or doing work that he agrees to do in a certain way, the contractor certainly cannot complain if the city refuses to pay except upon his compliance with the terms of the engagement."

Since the argument there has been evolved the notion that the few constitutional limitations upon the power of the state to control at will through legislative action all the affairs of municipalities, in some way helps out the contention of the majority that the state is not the proprietor in the grading and construction of the street in question. It seems to me that the effect of these exceptions is to prove the rule, if proof be needed, that the state can do what it chooses in respect to public improvements anywhere within its borders, whether the territory affected be within city limits or in the rural sections of the state, provided only that it does not transcend the limitations that the people have seen fit to place upon that power by means of the Constitution. That instrument will be searched in vain for any restrictions upon the power of the legislature to grade or improve highways. The legislature may provide for the building of bridges over streams separating counties, or towns, or both. It may do this at the expense of the state, or at the expense of the towns affected, or of the adjoining counties, or the expense may be apportioned in such manner as the state sees fit. It may build and improve roads at the joint expense of the state and the locality more immediately benefited by the construction of the road, or part of the expense may be assessed upon the property of individuals abutting upon the improved highway; and in cities it may determine to have streets graded and improved and the entire expense assessed upon the property in the neighborhood which is supposed to benefit by the improvement; or it may assess the entire sum upon the city, or apportion the cost between the two. But however the moneys necessary to pay the expense of such an improvement may be raised, it is the state that authorizes the improvement, selects the agency by which it is conducted and alone determines the source from which

the money needed to pay the expense shall come, and its power in that respect has no limitation whatever.

The prevailing opinions discuss a question which is not up for decision, namely, whether the legislature has the power to provide that the municipal authorities shall pay to their employees going wages. As the discussion which that question has received is, in my opinion, *obiter*, I shall not refer to it further than to say that I dissent from the views expressed in relation thereto on the ground that the statute offends no provision of the Constitution when it undertakes to provide that the city shall pay the prevailing rate of wages to those who work for it. Who denies the power of the legislature to fix the rate of compensation for the mayor, the comptroller, the police commissioner, the clerk, the attendant and the messenger? If any one does I have not heard him. Why may it not then fix the rate of compensation of the engineer in charge of its heating and ventilating apparatus, its skilled mechanics or its street sweepers? Where in the Constitution is to be found the provision that so discriminates between the classes into which the public service is divided as to allow the legislature to provide certainty and stability of compensation as to the one and denies a similar power as to the other? My attention has not been called to such a provision, nor have I been able to find it after diligent search.

I have considered the constitutionality of the statute, because it has been insisted, as I think erroneously, that the feature of the statute which is in controversy here is unconstitutional. But if, on the other hand, it were to be conceded that it is unconstitutional, I do not see how it could avail this relator. If the contract were silent on the subject, and the claim made was that the contractor could not recover for work performed because he had not complied with the provisions of the statute requiring contractors to pay the prevailing rate of wages, then he would not only be in a position to attack the constitutionality of the statute, but an adjudication that it was unconstitutional would relieve him from the necessity of paying the prevailing rate of wages. But that is not this case.

In the contract between the city and this relator it is agreed in terms that "the wages to be paid for a legal day's work, as hereinbefore defined, to all classes of such laborers, workmen or mechanics upon all such public work, or upon any material to be used upon or in connection therewith, shall not be less than the prevailing rate for a day's work in the same trade or occupation in the locality within the state where such public work on, about or in connection with which labor is performed, in its final or completed form, is to be situated, erected or used." And it was further in terms agreed that "this contract shall be void and of no effect unless the person or corporation making or performing the same shall comply with the provisions of the Labor Law." So that not only in terms did the contractor agree to pay the prevailing rate of wages, but the agreement also in effect made the provisions of the Labor Law a part of the contract.

Whether, therefore, the statute was unconstitutional or not, there was nothing to prevent this relator from consenting to the incorporation of the phraseology of the statute into the contract, and, when he did that and voluntarily executed the contract, as in this case, he cannot effectively plead as an excuse for the violation of his contract that, inasmuch as certain of its provisions are void when embodied in a statute, they are also void when incorporated into a voluntarily-executed contract.

While the majority of the Appellate Division agreed that the statute was constitutional in so far as it provided for the payment of the prevailing rate of wages, and also that the relator, having voluntarily executed the contract, he is entitled to payment for work done only upon condition of his performing its stipulations, still they were of the opinion that the relator was entitled to a mandamus because the officers of the municipal corporation had failed to avoid the contract prior to the institution of the proceeding.

If the conclusion of the majority was wrong in this respect, they conceded that the defendant rightly succeeded at Special Term, and, as it seems to be very clear that it was wrong, I

shall content myself with a brief presentation of the reasons, and shall omit all reference to the question, also discussed, whether the contract became void by direct operation of the statute upon the contract and its conceded breach. If the statute purported to accomplish such a result, the court thought that it might be unconstitutional. But I shall not consider whether it does purport to accomplish such a result or whether, if it did, it would offend against the Constitution, for, as I view it, the question is not before us. Certainly it cannot affect the disposition of this matter if what the comptroller did operated to avoid the contract. It is because I think he did all that the situation required in order to enable the city to take advantage of the relator's breach of the contract that leads me to a different result than that reached by the Appellate Division, for we alike agree on the constitutionality of the statute, so far as it is involved in the proceeding and in the binding effect of every provision of the contract.

It is not easy to appreciate the argument that admits the validity of the contract; its open violation by the relator; concedes that the provision is clear and unambiguous that declares it shall be null and void in the event of such a violation, and still contends that a recovery may be had in the face of the defense urged by every legal method, viz., that the relator cannot recover because the contract has become void by his act.

What act it was necessary for the comptroller to do in order to take advantage of the defense the relator had furnished other than first to refuse to pay and afterwards to defend on the ground that the contract was void, owing to the relator's violation of it, has not been suggested. It has been found easier, no doubt, to say that the comptroller, as the fiscal officer, had to do something than to point out the thing he had to do.

It is the relator's violated agreement which entitles the defendant to claim that this contract is no longer of any effect. For it must not be forgotten that this relator comes into court admitting that he has violated the contract by failing to pay

the prevailing rate of wages as he agreed to do, and by his contract he agreed that the effect of his failure to do so should cause the contract to become void and of no effect.

The argument that the relator is entitled to a mandamus against the comptroller because he had not avoided the contract before this proceeding was instituted, seems to me without force. It appears affirmatively that the comptroller was not informed that the relator was violating his contract until. the 19th day of April, 1900, and that he set on foot an investigation for the purpose of learning the truth of the matter immediately thereafter, with the result that the information received by him was fully confirmed. Now, the certificate made by the commissioner of highways certifying to the correctness of the relator's account, showing a balance due, to secure a warrant for which this proceeding was instituted, was dated April 23rd, 1900, or only four days after the comptroller was first advised of any act leading him to suspect that the relator was violating the contract. From these facts it is apparent that there was nothing in the situation to justify the conclusion that the comptroller allowed him to go on with his work after knowledge on the part of the comptroller that it was within his power to avoid the contract on behalf of the municipality. On the contrary, it is apparent that no part of the work for which a warrant is claimed was performed after the comptroller's knowledge of the relator's default. This proceeding was instituted about three weeks afterwards, and hence it is manifest that so far as this claim is concerned the relator has nothing to complain of in the conduct of the comptroller, assuming, without admitting, that a complaint of that general character could have any legal value towards restoring to life a void contract.

This proceeding was instituted against the comptroller because he refused to deliver to the relator a warrant for the amount of the certified account. The reason for it is set up in his return, and is to the effect that the relator had executed a contract by which he had agreed that in the event of his failure to perform certain of its terms and conditions, the con-

tract should be void; that he had failed to comply with such terms, and that hence the contract is void and the city not liable. Now, if there is anything else that the comptroller was bound to do under the circumstances in order to get rid of paying the amount claimed to be due under a contract that had become void, it has not been pointed out. He resisted payment both before and after the commencement of legal proceedings on the ground that the contract had become void because of the conduct of the contractor, and that is all he was obliged to do in order to relieve the city from making further payments under a void contract.

If the facts were as assumed by the learned judge at the Appellate Division, that the city authorities with knowledge of the violation of a contract which authorized the city to treat it as void nevertheless permitted the contractor to go on with his work by which the amount in question was earned, it might very well be that a court of equity would undertake to relieve a party from the loss that would otherwise result on the ground that it was the duty of the officers of the city to speak and not to hide their intentions for the purpose of getting work for nothing out of the contractor. But those considerations have no place in a proceeding by mandamus, where the relator can only succeed by establishing a clear legal right to that which he demands.

I advise a reversal of the order of the Appellate Division and an affirmance of that of the Special Term.

HAIGHT, J. (dissenting). If the Labor Law, so called, is properly construed in the prevailing opinion it may be that the conclusion reached is justifiable. If the wages provided for by the statute to be paid laborers has reference only to those who are in the prime of life, and in the full possession of their physical powers, then its effect may be to exclude from employment and the means of earning a livelihood, laborers who have passed the prime of life, and have suffered a partial impairment of their physical powers, and thus create a class

distinction which is not only objectionable but vicious. I, however, do not think that the statute should receive such a construction. It first fixes the number of hours that shall be deemed a legal day's work, and then provides that "The wages to be paid for a legal day's work as hereinbefore defined to *all classes* of such laborers, workmen or mechanics upon all such public works, or upon any material to be used, or in connection therewith, shall not be less than the *prevailing rate* for a day's work in the same trade or occupation in the locality within the state where such public work on, about or in connection with which such labor is performed in its final or completed form, is to be situated, erected or used." It will be observed that the statute expressly relates to "all classes" of laborers. This includes the old and the young, as well as the middle aged and those in the full possession of their powers. But it is claimed that they all must be paid the same wages per day, and that this will operate to exclude from employment all those who have passed their prime and who are unable to perform as much labor as those who are strong and vigorous; but such does not appear to me to be the meaning of the statute. It does not provide that each laborer shall be paid the same wages. It is that they shall be paid the "prevailing rate." What is the "prevailing rate?" The Century Dictionary defines the word "prevailing" as "prevalent; current; general; common." It is the prevailing, current, general or common rate. In other words, it is the market rate or that which the services are fairly and reasonably worth. Each laborer must, therefore, be paid what his services are worth in the market in that locality. If he is in the prime of life, in the full vigor of his manhood and able to perform a large day's work he is entitled to receive the full value thereof. If he has passed his prime and vigor and consequently cannot earn so much he is still entitled to receive the value of such services as he is able to perform. If the prevailing or the market rate means the reasonable value, it, in the absence of a contract expressly fixing the rate, is just the amount which a court of law would award as damages in an

action to recover pay for services rendered, and to this extent
the provision is but the re-enactment of a part of the common
law.    Under this construction of the statute there is nothing
in its provisions that is objectionable or harmful.    It merely
gives to the laborer that which he earns and nothing more.
It is only what justice and good morals demand.    It renders
to the servant that which is properly his, and does not deprive
the state or any of its municipal governments of any money or
property belonging to it.    It may be that the statute was
intended to prohibit the making of contracts fixing the rate
of wages at a less sum than that which the labor was fairly
and reasonably worth, but I know of no provision of the Con-
· stitution, either Federal or State, which prohibits the legisla-
ture, in sustaining a just public policy, from enacting· that the
state or the municipal governments thereof, or persons contract-
ing therewith for the performance of public work, shall not,
through contract or otherwise, take advantage of the necessi-
ties of the poor and laboring classes and compel them to take
employment for wages less than their services are fairly and
reasonably worth in the locality.

    The statute under consideration contains a clause requiring
persons making contracts for the doing of public work to
insert in the contract a provision requiring the payment of
laborers at the prevailing rate.    Possibly the legislature can-
not accomplish through indirection that which it is prohibited
from doing directly ; but if I am correct in my view, the legis-
lature may, as part of its public policy, by a direct provision,
require the payment in full of the value of the services ren-
dered to the state or a division thereof, or upon any of the
public works therein.    This view of the statute is an answer
to the contention that it authorizes the appropriation of the
money or property of a city government to other than city
purposes.    The laborer who performs work for a city govern-
ment or upon a contract upon public works of the city is
entitled to receive the value of his services rendered, and so
long as the city is not required to pay him a greater sum the
payment is for a city purpose, and such payment is not an

appropriation for any other purpose. I favor a reversal of the order of the Appellate Division.

BARTLETT and VANN, JJ., concur with O'BRIEN and LANDON, JJ., O'BRIEN, J., also concurring with LANDON, J., for affirmance, and MARTIN, J., concurs with O'BRIEN, J.; PARKER, Ch. J., and HAIGHT, J., read dissenting opinions.

Order affirmed.